## Case No. 6,060.

HARDY et al. v. HARBIN et al.

[4 Sawy. 536.] [1]

Circuit Court, N. D. California.　July 29, 1865.

HOLDER OF LEGAL TITLE, WHEN CONVERTED INTO TRUSTEE—MEXICAN PREFECT HAD NO JURISDICTION — CALIFORNIA PROBATE ACT HAD NO RETROSPECTIVE APPLICATION — MEXICAN LAND GRANTS — EFFECT OF CONFIRMATION — PATENT UNDER MEXICAN GRANT—PURCHASERS CHARGEABLE WITH NOTICE OF FACTS DISCLOSED BY DOCUMENTS THROUGH WHICH THE TITLE IS TRACED—LIMITATION — CALIFORNIA STATUTE OF LIMITATIONS — PARTIES DEFENDANT TO SUIT TO CHARGE HOLDERS OF LEGAL TITLE AS TRUSTEES.

1. Wherever property is acquired by fraud, or under such circumstances as to render it in-

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

equitable for the holder of the legal title to retain it, a court of equity will convert him into a trustee of the true owner.

[Cited in Norton v. Meader, Case No. 10,351; Lakin v. Sierra Buttes Gold Min. Co., 25 Fed. 341; Lang Syne Min. Co. v. Ross (Nev.) 18 Pac. 362; Butte Hardware Co. v. Schwab (Mont.) 34 Pac. 28; South End Min. Co. v. Tinney (Nev.) 35 Pac. 91.]

2. A prefect under the Mexican government in California had no jurisdiction over the estates of deceased persons, or authority to appoint an administrator.

3. The statute of California for the settlement of the estates of deceased persons has no application to the estates of persons who died previous to the organization of the state government.

4. A confirmation of a Mexican land grant under the act of congress of March 3, 1851 [9 Stat. 631], inured to the benefit of the confirmees, so far as the legal title was concerned. It determined nothing as to the equitable relations between them and third parties.

[Cited in South End Min. Co. v. Tinney (Nev.) 35 Pac. 92.]

5. A patent issued by the United States for land granted by the former government is evidence that the title had passed by the grant from the former government, or that such equities had existed under that government in favor of the alleged grantee as to require or justify the cession of the title, and also that by conveyances regular on their face, the legal title had apparently passed from the grantee to the claimant; but it does not affect any equitable relations of the holders of subsequent conveyances from the grantee to each other, or to third parties.

6. Where a purchaser of land cannot make out his title except through an instrument which leads to a particular fact, he is chargeable with notice of such fact. Accordingly where a patent of the United States, upon confirmation of a Mexican grant, recites a transfer of the grantee's interest to the patentee by an administrator, a purchaser from the patentee is chargeable with notice of the character of the conveyance of the administrator, and the proceedings upon which it was made.

7. Where parties secured to themselves the legal title of a Mexican grant, by the presentation to the board of land commissioners of a worthless document as a transfer of the grantee's interest, whereby a fraud was committed upon the heirs of the grantee: *Held*, that the patentees would in equity be converted into trustees, and that the statute of limitations would not commence running in such case against the rights of the heirs until their discovery of the fraud.

8. The statute of limitations of California applies to both equitable and legal remedies; it is directed to the subject-matter, and not to the form of the action or the tribunal before which it is prosecuted.

[Cited in Norris v. Haggin, 28 Fed. 279.]

9. In a suit in equity to convert the holders of the legal title to land into trustees for the true owners, a previous holder of such legal title who has parted with all his interest in it is not a necessary party.

This was a suit in equity to charge the defendants [James M. Harbin and others] as trustees of certain real property in California, and to compel a transfer of the title. It came before the court on demurrer to the bill.

H. H. Hartley and Joseph P. Hoge, for demurrer.

W. W. Chipman and B. S. Brooks, contra.

FIELD, Circuit Justice. This is a suit on the equity side of the court to charge the defendants as trustees of certain real property, situated in the county of Yolo, and to enforce a transfer of the title to the complainants, Alexander Hardy and Ellen Hardy, the wife of Thomas Botham. Alexander and Ellen claim to be the only surviving children and heirs at law of one, John Hardy, deceased; and the case presented by their bill is briefly this:

Hardy, their father, was a native of Upper Canada, and in 1824 intermarried in that province with one Nancy Wright, a citizen of the United States. Three children were the issue of this marriage—Alexander, Ellen and Nancy. Alexander was born in 1825, in New York, and is a citizen of that state, and is at present a soldier in the army of the United States. Ellen was born in Canada, in 1827, and intermarried in 1847 with the complainant, Thomas Botham. Both she and her husband are subjects of the queen of Great Britain. Nancy was born in New York, in 1829, and died at the age of six years. The wife of Hardy died in 1832, and soon afterward Hardy himself left Canada; and after working one or two years at different places on the Mississippi river, proceeded to Texas, and thence to Mexico, and engaged in the military service of the latter country.

In 1843 he came to California, having in the meantime become a Mexican citizen by naturalization, and assumed the name of Thomas Hardy—by which name, or that of Thomas M. Hardy, he was always known in this country. In October of the same year, he obtained from Micheltorena, then governor of the department of California, a grant of land of the extent of six square leagues, situated in the present county of Yolo. The grant was issued to him in his assumed name of Thomas Hardy. In October, 1848, he died at Benicia, in this state, intestate, possessed of the real property thus granted to him; and also of personal property of the value of several thousand dollars.

In March, 1850, the prefect of the district of Sonoma assumed jurisdiction over the estate of the deceased, and appointed one Stephen Cooper, of Benicia, administrator, and issued letters of administration to him. Under color of these letters, Cooper took possession of the property of the deceased, and proceeded to act as administrator. In 1851, the prefect, his office having been abolished by law, and probate courts having been established in the different counties of the state, transferred the papers and documents relating to the estate of Hardy to the probate court of the county of Solano. Soon afterward, upon the petition of the administrator, the probate court made an order for the sale of the real property; and under it the property was sold for the sum of $6500. The sale was confirmed by the probate court, and in July, 1851, a conveyance was executed by the administrator to the purchasers.

In 1852, the claim of the purchasers and parties deriving title from them, to the land in question, was presented to the board of commissioners, created under the act of congress of March 3, 1851, for confirmation. In July, 1855, the claim was confirmed by the board, and afterward, in March, 1857, on appeal, by the decree of the district court of the United States. This decree was made final by stipulation of the parties; and in July, 1858, a patent of the United States was issued to the claimants. The defendants derive whatever title they possess to the premises under the patent and the conveyance of the administrator.

The complainants insist that the prefect of the district of Sonoma had no jurisdiction over the estate of Hardy, or authority to appoint an administrator thereof, and that the proceedings and appointment, and all acts under color of the appointment, are null and void; and that the probate court of Solano county acquired no jurisdiction by the transfer to it of the papers of the prefect.

The complainants also insist that even if the probate court acquired any jurisdiction over the estate, it never acquired jurisdiction to order a sale of the real property of the decedent by reason of various defects and omissions in the petition and proceedings for the sale, which the bill sets forth; and also that the sale was vitiated by fraudulent practices on the part of the administrator and purchasers, which the bill details at length, and of which it alleges the defendants had notice before they acquired their respective interests.

The complainants never received any intelligence from Hardy after he left the Mississippi river, except by a letter written from Monterey, in the spring of 1847 or 1848, and until within the past three years had no information as to his residence or movements, or of the acquisition of the property, or of the various proceedings relating to the same, which are stated in their bill. They ask, therefore, that the defendants may be charged as trustees of the title of the real property to the extent of the several interests held by them for the benefit of the complainants, Alexander and Ellen, and be decreed to transfer the same to said complainants, and deliver up the patent and all other muniments of title connected with the property.

To the bill of complaint the defendants demur on several grounds, the principal of which are: First, that the bill does not contain any matter of equity upon which the court can base a decree, or grant the complainants any relief. Second, that the claim of the complainants is a stale claim, and barred by the statute of limitations; and third, that there is a defect of parties defendants.

The ground upon which the bill proceeds is, that the defendants have obtained the legal title to property, of which the father of the complainants died possessed, and which the complainants inherited; that the defendants

took the legal title, with notice of the invalidity of the means by which it was obtained; and should, therefore, upon obvious principles of justice, be required to give it up to the true owners. The bill is filed for the purpose of having a trust declared and enforced, the complainants relying upon the established doctrine that wherever property is acquired by fraud, or under such circumstances as to render it inequitable for the holder of the legal title to retain it, a court of equity will convert him into a trustee of the party actually entitled to its beneficial enjoyment. And the bill presents a clear case for the application of this doctrine. The prefect of Sonoma had no jurisdiction over the estate of the deceased, nor any authority to appoint an administrator. Prefects were executive officers of the government. It was their duty to maintain public order and tranquillity, to publish and enforce the laws, and to exercise a general supervision over the subordinate officers, and the public interests of their districts. They were empowered to impose small fines in the enforcement of their authority, and to hear complaints against inferior officers of the district; but beyond this extent they were not clothed with any judicial functions.

Nor did the probate court of Solano county acquire any jurisdiction over the estate of the deceased after the transfer of the papers from the prefect. The statute of California, for the settlement of the estates of deceased persons has no application to the estates of parties who died previous to the organization of the state government. This was expressly held by the supreme court of California, in Grimes v. Norris, with reference to the probate of a will executed in 1848 (6 Cal. 621); and the ruling in this respect was affirmed by the same court in the subsequent case of Tevis v. Pitcher, 10 Cal. 465. The act which provides for the probate of wills also regulates the manner in which the estates of parties dying intestate shall be closed, and is equally limited in its application to cases arising subsequent to the adoption of the constitution. It was obviously the intention of the legislature to leave all estates of decedents, who died previously, to be settled under the law as it then existed; and such is the ruling in a recent case of the supreme court of the state. Downer v. Smith, 24 Cal. 114. It was, therefore, under color of legal proceedings, every step of which was a nullity, that the conveyance of the alleged administrator was executed. That conveyance enabled the purchasers and parties holding under them to present the grant made to Hardy by the Mexican government to the board of land commissioners, and to obtain a confirmation of the claim asserted by them to the land it embraces, and ultimately the patent of the United States. Thus, by means of an instrument purporting to transfer the interest of which Hardy died possessed, but in fact transferring nothing, they obtained a

standing before the federal tribunals, and have secured to themselves the legal title from the government of the United States. It is the possession of this legal title, as shown by the confirmation and patent, which precludes the complainants, who are the sole surviving heirs of the deceased, from instituting or maintaining ejectment for the premises, and forces them to seek relief from a court of equity. And it is upon the confirmation and patent that the defendants rely to resist the claim of the complainants. Their position is, that the confirmation inured to the benefits of the confirmees, and that the patent is conclusive evidence of the validity of their title—that it is the record of the government upon it, which cannot be questioned, except in direct proceedings instituted in the name of the government or by its authority.

It is undoubtedly true that the confirmation inured to the benefit of the confirmees, so far as the legal title to the premises was concerned. It established the legal title in them, but it determined nothing as to the equitable relations between them and third parties. The object of the government in the passage of the act of March 3, 1851, was to separate the public lands from those which were private property, and to discharge its treaty obligations by protecting private claims. The only question in which the government was concerned, and which demanded its consideration was, what interests in land had the former sovereignty parted with; not what had transpired between private parties subsequent to the action of that sovereignty. And in conformity with this view is the language of the supreme court of the United States in Castro v. Hendricks, 23 How. [64 U. S.] 442. After stating that to accomplish the purposes of the act of March 3, 1851, every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican governments, was required to present the same to a board of commissioners, the court said: "The mesne conveyances were also required, but not for any aim of submitting their operation and validity to the board, but simply to enable the board to determine if there was a bona fide claimant before it under a Mexican grant; and so this court have repeatedly determined that the government had no interest in the contests between persons claiming ex post facto the grant." And the supreme court of California, whilst declaring that the confirmation inured to the benefit of the confirmee, has in frequent instances qualified the declaration, by stating that equities between the confirmees and third parties remained unaffected. Thus, in Estrada v. Murphy, 19 Cal. 272, the court said: "If the confirmee, in presenting his claim, acted as agent, or trustee, or guardian, or in any other fiduciary capacity, a court of equity, upon a proper proceeding, will compel a transfer of the legal title to the principal, cestui que trust, ward, or other party equitably entitled to the same, or sub-

ject it to the proper trusts in the confirmee's hands. It matters not whether the presentation was made by the confirmee in his own name in good faith, or with intent to defraud the actual owner of the claim, a court of equity will control the legal title in his hands so as to protect the just rights of others."

The patent is undoubtedly a record of the government upon the title of the claimant. Before it is issued numerous proceedings are required to be taken before the tribunals and officers of the United States, having for their object the ascertainment of the validity of the grant, preferred under Mexican law and authorities, and the identification of the land to which it is, or should be restricted. As the last act in the series of proceedings, and as a result of those previously taken, it is issued. It is, therefore, record evidence on the part of the government that the previous grant was genuine, and entitled to recognition and confirmation by the law of nations, or the stipulations of the treaty between Mexico and the United States, and is correctly located so as to embrace the premises described. Until vacated and set aside by proceedings instituted in the name, or by authority of the government, it is evidence that the title had passed by the grant from the former government, or that such equities had existed under that government in favor of the alleged grantee, as to require or justify the cession of the title, and also that by conveyances, regular on their face, the legal title had apparently passed from the grantee to the claimant; but it is not evidence of any equitable relations of the holders of subsequent conveyances from the grantee to each other or to third parties, for such relations were not submitted to the tribunals of the United States for adjudication in the settlement of private land claims under Spanish and Mexican grants.

There is nothing in the numerous decisions of the supreme court of this state upon patents of the United States which militates against this view. Those decisions, with one or two exceptions, were rendered in actions of ejectment, and only affirm the conclusiveness of the patents in determining the title of the patentees in such actions, as against attempts to resist their operation by parties holding either under confirmed grants, or by alleged pre-emption and settlement under the laws of the United States. It is true it is said in Stark v. Barrett, 15 Cal. 361, that the patent, in recognizing the validity of the grant, upon the confirmation of which it is issued, necessarily establishes the validity of all properly executed intermediate transfers of the grantee's interest; but this is no more than saying that if the grant was valid, a valid title was transferred by properly executed conveyances of the grantee, a proposition which requires no explanation. And the decision in Clark v. Lockwood, 21 Cal. 220, to which counsel refer, only goes to the extent of declaring that in an action of ejectment by

the vendee of the confirmee, it is unnecessary to introduce the intermediate conveyances from the Mexican grantee to the confirmee, the confirmation being an adjudication that the legal title was in him at the date of the presentation of his petition to the land commissioners. The opinion of the court expressly limits the conclusiveness of the adjudication to the legal title in that action, and cites from the case of Estrada v. Murphy [supra] to show that equities against such titles may be enforced by proper proceedings in a court of equity. The action of ejectment deals with legal titles; the patent determines the position of such title, and when the patentee is other than the Mexican grantee, it is evidence that he had made such a prima facie showing before the proper authorities of having a transfer of the grantee's interest, as to justify its having been issued to him. In the opinions filed on rendering the decisions in the state courts cited by counsel, though relating to the legal title, reference is made in several instances to possible equities of third parties, for the purpose of qualifying the general language used as to the conclusive effect of the patents and to direct parties asserting such equities to the proper tribunal for relief.

In Rico v. Spence, 21 Cal. 504, which was a suit in equity to establish and enforce a trust, the court recognized that equities might exist which would control the title of the patentees, by the observations made to show that there were no such equities in that case. "The plaintiffs," said the court, "do not show the possession of any equities which can control the legal title. They present no evidence of the existence of any such relation of trust or confidence between them and the patentee, as imposed upon the latter the duty of acting for their benefit, and of holding the title for their use. There was no fiduciary relation between them. Nor does it appear that there was any mistake committed by the authorities at Washington in issuing the patent to the defendant Spence. The instrument was intended for the party who received it. Nor is it pretended that any fraud was committed by the patentee in the deraignment of his title from the original claimant of the premises. The genuineness and due execution of the intermediate conveyances from Jose Mariano Estrada to him are not questioned. Nor can it be said that he acquired his title with notice of any equitable rights of the plaintiffs which could affect him."

The case of Brush v. Ware, in the supreme court of the United States, 15 Pet. [40 U. S.] 93, is in many respects similar to this. In that case it appeared that one Hockaday was a captain on the Virginia line on the continental establishment, which, under the acts and regulations of congress, entitled him to four thousand acres of land in the Virginia reservation, within the state of Ohio. A certificate of this military right having been obtained from the executive council of Virginia, the executor of Hockaday fraudulently assigned the same, in 1808, to one Ladd. On the certificate and assignment, Ladd obtained four warrants of a thousand acres each, as assignee of the executor. One of these warrants was assigned by Ladd to Hoffman, by whom certain lands were entered. By various transfers, the interest of Hoffman came into the possession of Brush, to whom patents of the United States were issued in 1818. In 1839, the heirs of Hockaday filed a bill to compel the patentee to convey the lands to them, alleging that he was a purchaser with notice of their superior title. The defendant, among other things, set up in his answer that he had no recollection or belief that he had ever seen the warrant, entry or survey, or copies of either, upon which the patents issued; that he was an innocent purchaser for a valuable consideration; that he had no notice of the complainants' claim before the emanation of the patents, or any knowledge of any fraud or what the will of Hockaday contained; that he had been in possession under claim of title since 1808, and had made lasting and valuable improvements, and that the complainants were barred by the statute of limitations. But the court held that Brush was chargeable with notice of the imperfection of the transfer of the executor by the facts which appeared upon the face of his title papers. The incipient step in the acquisition of his title was the entry in the books kept in the office of the surveyor. This entry could only be made upon the production to the surveyor of the warrant, and filing it, or a certified copy, in his office. A survey and plat of the land were then made and returned to the office of the principal surveyor, by whom they were transmitted to the general land-office, accompanied by the original warrant, or a copy of it. The patents were then issued. The original warrant, which was the foundation of the title, stated on its face that it was issued to Ladd as assignee of the executor of Hockaday, and the patents were in terms issued to the patentee as the last of several assignees from the executor. The attention of the patentee was thus directed to the will of Hockaday, in which the authority must have been found, if it existed at all, for the assignment by the executor. That will contained no such authority, and so the patentee would have ascertained had he made the proper inquiries. And the court held that he was bound to look to every document which was essential to the validity of the title. As he neglected to do this, he was not entitled to any greater protection than if he had made the inquiry and ascertained the real facts of the case. "The question," said the court, "is not whether the defendant in fact saw any of the muniments of title, but whether he was not bound to see them. It will not do for a purchaser to close his eyes to facts—facts which were open to his investigation by the exercise of that diligence which the law imposes. Such purchasers are not protected." The court therefore affirmed the decree directing a conveyance to the heirs.

The case of Reeder v. Barr, 4 Ohio, 458, decided by the supreme court of Ohio, cited in the opinion in Brush v. Ware [supra], is equally in point. There the patent was issued to one "Newell, as assignee of the administrator of Henson Reeder, deceased," and the court held that this disclosure of the rights of the patentee, and of the manner in which they were acquired, was sufficient to charge a subsequent purchaser with notice of the equitable rights of the heirs at law of Reeder. "If, in the investigation of a title," said the court, "a purchaser, with common prudence, must have been apprised of another right, notice of that right is presumed. Here Barr, in tracing his title, must have seen from the patent that Newell's right was derived from an administrator, who possessed no title to the land himself, and whose deed could be available only by previous compliance with certain legal formalities. If the assignment of an administrator, per se, conveyed the equitable rights of the intestate, the purchaser might stand in a different situation. As it is, we are of opinion that the recital in the patent is sufficient to put a man of ordinary prudence to an inquiry for the rights of the heirs, and that a subsequent purchaser must, at his peril, ascertain whether those rights have been regularly extinguished. Authorities are cited to show that presumptions of regularity are to be made in favor of public officers. Williams v. East India Co., 3 East, 200; Hartwell v. Root, 19 Johns. 347. And that the existence of a grant is sufficient ground to presume that every prerequisite has been performed. Polk v. Wendell, 9 Cranch. [13 U. S.] 98, 5 Wheat. [18 U. S.] 293; King v. Hawkins, 10 East, 216. If this grant were a simple conveyance to Newell, his assignees might, perhaps, claim the benefit of these rules; but the grant, upon its face, shows that the heirs of Reeder were the owners of the estate, after the death of their ancestor, and it is going too far to say that there is a legal presumption not only that the officers of government have performed their duties, but that the rights of the heirs of Reeder have been divested by a judgment of a court of competent jurisdiction."

The principle upon which these decisions proceed, is the familiar one, that where a purchaser cannot make out his title except through an instrument which leads to a particular fact, he is chargeable with notice of such fact. In the case at bar the principle applies, and is a full answer to those of the defendants who took their title from the patentees. The patent, we must presume, was issued in the ordinary form of such instruments, upon the confirmation of a Mexican grant, with a recital of the existence of the grant; the conveyance of the grantee's interest by the administrator, the confirmation of the claim under the grant, its survey upon the confirmation and the approval of the survey by the proper officers of the government. Such are the usual recitals, and of course, in the present case, they directed the attention of all subsequent purchasers to the examination of the conveyance of the administrator and the proceedings upon which it was made.

The position that the complainants are not entitled to relief, because by the act of March 3, 1851, all lands, the claim to which was not presented within two years thereafter, were to be deemed part of the public domain, hardly merits serious consideration. It cannot be affirmed that if the sale by the administrator had not taken place, friends of the deceased would not have made efforts to ascertain whether there were any heirs to the estate, and have not succeeded in finding them; nor that the property would not have been taken in charge by officers of the state as a vacant inheritance, and the grant presented for adjudication to the proper tribunals of the United States; nor that relief might not have been afforded the heirs when the property was discovered by appropriate legislation. The finder of personal property might, with equal propriety, justify its retention, on the ground that the true owner would never have found it. The claim presented by the claimants, resting upon solid principles of justice and right, must be sustained, upon the showing of the bill, unless barred by the statute of limitations.

The statute of limitations of this state is peculiar. It differs essentially from the English statute, and from the statute of limitations in force in most of the other states of the Union. Those statutes, in terms, apply only to particular legal remedies, and courts of equity are said to be bound by them only in cases of concurrent jurisdiction, and in other cases to act only by analogy to the statutes, and not in obedience to them. But in this state the statute applies both to equitable and to legal remedies. It is directed to the subject-matter, and not to the form of the action or the tribunal before which it is prosecuted. Such is the language of the supreme court, the only authoritative interpreter of the laws of the state. Lord v. Morris, 18 Cal. 486.

The question then is, whether the statute bars the relief prayed, and not whether, as insisted by counsel, the claim on general principles adopted in the administration of equity is a stale claim, although we may add on this latter head that the claim has upon such principles no feature that should bar its enforcement on that ground. The statute provides that certain actions shall be brought within three years after the cause of action shall have accrued, but declares that in an action for relief on the ground of fraud, the cause of action "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." This exception covers the case at bar. The patentees secured to themselves the legal title by the presentation to the board of land commissioners of a worthless document as a transfer of the grantees' interest, and they

prosecuted a claim under this document for years. By these proceedings a fraud was committed upon the heirs of Hardy, and not until its discovery did the statute commence running against their rights. The bill avers such discovery within the years prescribed. And the defendants who took title under the patentees are chargeable with notice of the character of the claim under which the patentees secured the title, and consequently are precluded from protection as innocent purchasers. They are therefore chargeable with constructive fraud in taking title from the patentees, however ignorant in fact of the rights of the heirs, and however honest in their intentions they may have been. "Another class of constructive frauds," says Mr. Justice Story, after enumerating several classes, "consists of those where a person purchases with full notice of the legal or equitable title of other persons to the same property. In such case he will not be permitted to protect himself against such claims; but his own title will be postponed, and made subservient to theirs. It would be gross injustice to allow him to defeat the just rights of others by his own iniquitous bargain. He becomes, by such conduct, particeps criminis with the fraudulent grantor; and the rule of equity, as well of law, is 'Dolus et fraus nemini patrocinari debent.' And in all such cases of purchases with notice, courts of equity will hold the purchaser a trustee for the benefit of the persons whose rights he has thus sought to defraud or defeat."

This doctrine has frequent illustration in the adjudged cases, where a purchaser takes his deed with notice of a prior unrecorded deed of the same property against which he invokes the registry acts. A court of equity treats the taking of the second deed under such circumstances, and attempting to hold the property as a fraud against which it will grant relief. "The ground of it," said Lord Hardwicke, in speaking of this doctrine, "plainly is this. that the taking of a legal estate after notice of a prior right, makes a person a mala fide purchaser (and not that he is not a purchaser for a valuable consideration in every other respect); this is a species of fraud, and dolus malus itself; for he knew the first purchaser had the clear right of the estate, and after knowing that, he takes away the right of another person by getting the legal estate. And this exactly agrees, with the definition of the civil law of dolus malus. * * * Now if a person does not stop his hand, but gets the legal estate when he knew the right of equity was in another, machinatur ad circumveniendum; and it is a maxim, too, in our law, that 'fraus et dolus nemini patrocinari debent.'" Le Neve v. Le Neve, 3 Atk., 646.

In the case at bar the bill does not stop merely with a statement of the matters showing the nullity of the proceedings before the prefect and probate court for want of jurisdiction, but it charges in these proceedings the most gross and palpable frauds. As indicating the motive with which the purchasers at the administrator's sale were actuated, the fraudulent practices alleged may be considered, even though the tribunal before which they were taken had no jurisdiction over the estate of the deceased. These observations are made with reference to the rights asserted by the complainant Alexander Hardy, for complainant Ellen is within another exception of the statute, by reason of her coverture.

It may be proper to observe in this place, to prevent misconception, that the complainant Ellen has been treated as having taken an interest in the property in controversy, as one of the heirs of the deceased Hardy. It appears that she is a British subject, and it may, perhaps, be contended that the entire estate passed to her brother, an alien not being able to take by inheritance. No point was made on this head on the argument, and we allude to it now only to say that it will be open for consideration on the final hearing.

It only remains to consider the objection that there is a defect of parties defendant. It appears from the bill that Estell was one of the purchasers at the administrator's sale, and one of the subsequent patentees, and the objection is that his heirs or legal representatives are not made parties. The bill also shows that he had parted with all his interest and claim long before his death. No decree could therefore pass against the heirs or representatives, and they are not, therefore, necessary parties. The proceeding is against the holders of the legal title.

The demurrer must be overruled, and the defendants required to answer the bill.

[See Case No. 6,059.]