[No. 1373.]

SOUTH END MINING COMPANY, RESPONDENT, v. CHAS. TINNEY, N. GLAVINICH AND FANNIE LEEHY, APPELLANTS.

PLEADINGS—EQUITABLE DEFENSE.—Of the right of a defendant to set up an equitable defense to an action for the possession of lands there can be no question, and as to such defense the case is to be tried in the same manner and upon the same principles as apply to an original bill in equity.

RELOCATION OF ABANDONED MINING CLAIM.—If an application for a patent to a mine be abandoned and the applicant fails to do assessment work on his location without having obtained a certificate of purchase the ground may be relocated under Rev. Stats. U. S., sec. 2324.

PATENT FRAUDULENTLY OBTAINED.—Several years after plaintiff had
      abandoned its application for a patent to a mining claim and after
      it had ceased to work it, defendants' grantor relocated a portion
      of the same ground and held continuous possession thereof there-
      after. This made the ground located defendants' mining claim.
      A year after the relocation, plaintiff, without giving notice of its
      intention so to do, and without defendants' consent or knowledge
      and surreptitiously, obtained a patent to the orignal claim. *Held*,
      that this was, under the circumstances, a putative and unequivo-
      cal fraud upon defendants. *Held, further*, that the patent being
      wrongfully obtained so far as defendants are concerned, still,
      plaintiff does not hold the patent title in trust for defendants.

      By majority of Court, MURPHY, C. J., and BELKNAP, J.

      BIGELOW, J., *contra*.

APPEAL from District Court, Lyon county; *Richard Rising*,
District Judge:

Action of ejectment to recover possession of a piece of
mining ground, 1,100 feet in length by 400 feet in width,
including the Comet ledge, to which the plaintiff alleges title
in fee since March, 1888, and ouster by defendants in March,
1891, and to obtain an injunction perpetually enjoining the
defendants from trespassing upon or removing ore from said
mining ground.

The answer denies the plaintiff's ownership, but admits
that the plaintiff obtained a patent for the ground from the
United States on March 29, 1888, and thereby acquired the
legal title to the same, but sets up the following facts as
avoiding the effects of this admission:

That in 1876 the plaintiff's grantors applied for a patent
for the Comet mining claim, covering the ground in dispute,
alleging it to have been located in 1872. That in 1878 the
plaintiff abandoned its application for a patent, abandoned
the claim, ceased to possess or occupy the same, and from that
time up to 1888 failed to do the annual work, or any work or
labor thereon, by reason of which abandonment and failure
the ground became subject to relocation. That on January
5, 1887, while the mine was in this condition, the defendants'
grantors entered thereon, and located, in accordance with the
laws of the United States, the Phœnix mining claim, cover-
ing a portion of the Comet claim, and defendants and their
grantors have ever since remained in possession thereof, in
strict compliance with the mining laws, and have expended

in its development some $6,000. . That on the 13th of April, 1888, they made a strike of ore therein, and thereupon the plaintiff " reorganized and resumed the prosecution of its said application for patent, and without the knowledge of the defendants or their grantors, and without posting or publishing any other or further notice of application for patent, procured the register and receiver to sell said Comet mining claim to plaintiff, and to issue a certificate of the purchase thereof; and, in order to induce said register and receiver to accept payment and issue said certificate of purchase, and for the purpose of inducing the government of the United States to sell and patent said mining claim to plaintiff, procured and caused to be presented to and filed in the office of said register and receiver of the United States land office, false and fraudulent affidavits and testimony, showing, and tending to show, that the annual labor and improvements had been made by plaintiff upon the said Comet mining claim and location between the date of location, to wit, 1872, and the date of such proof and certificate of purchase; said plaintiff well knowing that said affidavits and proofs were false and fraudulent."

The answer also set up the statute of limitations founded upon an adverse possession of more than two years.

Upon motion, the court below granted judgment for the plaintiff upon the pleadings, holding that the answer failed to state facts constituting any defense to the action.

Case argued orally and upon briefs.

*R. M. Clarke* and *E. D. Knight*, for Appellants:

Respondent's action is barred by the statute of limitations. (Gen. Stats. 3632; *420 Mg. Co.* v. *Bullion Mg. Co.*, 9 Nev. 240–249; *Gottschall* v. *Masling*, 2 Nev. 189; 3 Sawyer, 634.)

Appellants, having been in possession under claim of title and adversely to respondents for two years and more, have title by prescription and the defense of prescription is well pleaded. (*420 Mg. Co.* v. *Bullion Mg. Co.*, 9 Nev. 249; 3 Sawyer, 634; Gen. Stats., secs. 3635, 3638.)

The respondent is estopped to maintain this action against the appellants because of its acts suffering and encouraging them to locate the property and expend money and labor in discovering and developing the ledge. · The defense of estop-

pel is well pleaded. (Hermann on Estoppel, p. 1062, *et seq.* and citations, sec. 1063; *Walker* v. *Flint*, 3 McCreary, 507; *Smelting Co.* v. *Green*, 13 Fed. 208, 211, 212.)

The respondent acquired its title in fraud, and the land department had no jurisdiction and exceeded its power in granting the ledge of appellants in contention to the respondent. (*Cooper* v. *Roberts*, *St. Louis S. & R. Co.* v. *Kemp*, 104 U. S. 636; *U. S.* v. *Chapman*, 5 Saw. 528; *Stoddard* v. *Chambers*, 2 How. 285; *Morton* v. *Nebraska*, 21 Wall. 660; *Sherman* v. *Bruick*, 93 U. S. 216; *Patterson* v. *Tatum*, 3 Saw. 173; *Patterson* v. *Winn*, 11 Wheat. 380.)

Appellants claimed the land in contention as locators thereof, in pursuance of the laws of the United States, and are thus connected with the title of the United States, and, as such, can question the validity of respondent's patent for fraud or mistake or want of jurisdiction in the land department. (Am. & Eng. Ency. of Law, pp. 345, 346, citations and notes; *Craig* v. *Leitensdorfer*, 123 U. S. 209–212; *Rose* v. *Richmond Co.*, 17 Nev. 25, 60, 64; 75 Cal. 194; 50 Cal. 64; 96 U. S. 535; 82 Cal. 104; 98 U. S. 64, 65, 66; 83 Cal. 101, 539; 104 U. S. 636; 56 Cal. 277; 87 Cal. 371; 4 Saw. 536; 85 Cal. 448; *State* v. *Bachelder*, 80 Am. Dec. 410; *Lewis* v. *Lewis*, 43 Am. Dec. 540; *Lamont* v. *Stimson*, 62. Am. Dec. 696; *Shepley, et al.,* v. *Cowan, et al.,* 91 U. S. 300; *Moore* v. *Robbins*, 96 U. S. 530; *Johnson* v. *Towsley*, 80 U. S. 72.)

The patent of respondent is void as to any mineral ground included in it, which is in excess of the quantity the law authorizes the land department to grant. (*Davis* v. *Weibold*, II. Supreme Court Rep. 635, 636.)

The patent carries such side or incidental veins as have their tops inside of the surface line, that is, within the lawful distance from the center of the principal road. (Laws of the U. S., sec. 2320, Wade, p. 14.)

A mineral location in excess of the law is void as to such excess. (*Thompson v. Spray*, 72 Cal. 533; 114 U. S., 576.)

The act of congress, which grants the right to the mineral lands, permits the miners of the district to limit the width of mining claims to less than three hundred feet on each side of the center of the vein. (Revised Stats. U. S., sec. 2320; Wade, p. 14, 194; *Golden Fleece v. Cable*, 12 Nev. 312; *Gleason v. Martin White Co.*, 13 Nev. 442.)

The rules and customs of the miners have the force of statute laws and are binding upon the land department, and a grant of mineral land in excess of the amount allowed by the local rules and customs is void. The land department has no authority to grant more land than the law authorizes. The local laws of Devil's Gate mining district, in force when respondent's location was made, and when respondent's patent was issued, limit the width of the locations to two hundred feet on each side of the center of the lode. Respondent's patent, therefore, is void as to any ground included which is in excess of two hundred feet on either side of the lode.

*W. E. F. Deal*, for Respondent:

The act of congress under which the patent was issued was approved May 12, 1872. Section 4 of the statute defining the time of commencing civil actions is applicable solely to mining claims held by possession merely, and has no reference to mining claims which are held by title in fee simple. The concluding proviso shows that whatever is referred to in this section are those claims acquired by location or occupation. The section itself was adopted on March 5, 1867, more than five years prior to the time when the act was passed under which respondent acquired its title in fee simple by patent, and that section could only apply to such titles as could be acquired at the time when the act itself was passed. The act of congress of 1866 will not help the appellants in this matter, as it appears upon the face of the complaint that the patent was issued in 1888, and that it was issued for a piece of land the exterior boundaries of which are described by metes and bounds, together with the ledge applied for and all other ledges, the apices of which are within the exterior boundary lines of said claim, and such patent could have been issued only under the act of 1872.

The case of the 420 Mining Company, cited by counsel, has no bearing upon this case, for the reason that in that case the discussion of the statute of limitations of mining claims of Nevada was with reference to a contest between adverse claimants to the same mining ground.   *   *   *

Under the act of 1872 a patent for mineral land is issued

just exactly as a patent is issued for other land, with the addition that the patentee has the right to follow all ledges the apices of which are within the exterior boundary lines of his patented claim on their dip downward, although in their course downward such ledges should pass outside of the side lines of the patented claim. (*Gleason* v. *Martin White Mg. Co.*, 13 Nev. 442.)

According to the admissions of the answer, respondent acquired its title in fee simple to the premises described in the complaint on the 29th day of March, 1888, and this action was commenced on the 2d day of March, 1892. Four years had not elapsed at the time of the commencement of the action. The only sections of the statute of limitations of the State of Nevada that could run against respondent's title are sections 5 to 15 inclusive, as the respondent is the owner of the real property within the meaning of those sections by title in fee simple. The United States was the absolute and unqualified proprietor of the mineral land described in the complaint until it conveyed it to the respondent, and the statute does not run against the United States, but the title is freed of all prior claims or prior possessions by the granting of the patent. (*Van Sickle* v. *Haines*, 7 Nev. 260; *Patterson* v. *Tatum*, 3 Saw. 171; *Union M. & M. Co.* v. *Ferris*, 2 Saw. 179; 92 U. S. 343; 4 How. 169; 16 How. 48; 8 Wall. 650; 9 Wall. 187; 13 Wall. 92; 115 U. S. 408.)   *   *   *

The defendant in this action knew the title to the premises was in the United States subject to purchase, and therefore they cannot invoke any of the principles of the law of estoppel. (*Steele* v. *Smelting Co.*, 106 U. S. 456; *Biddleboggs* v. *Merced Mining Co.*, 14 Cal. 367.)

"It is undoubtedly true that a party will, in many instances, be concluded by his declarations and conduct which have influenced the conduct of another to his injury. The party is said in such cases to be estopped from denying the truth of his admissions. But to the application of this principle with respect to the title of property it must appear: *   *   *   Third, that the other party was not only destitute of all knowledge of the state of the title, but of the means of acquiring such knowledge; and, fourth, that he relied directly upon such admission and will be injured by allowing its truth to be disproved." (*Biddleboggs* v. *Merced M. Co., supra.*)

The defendants knew that the land in question was public mineral land of the United States to which they had no title. Independent of the admissions in the answer they must be held to know the law. Their entry and acts were according to the answer prior to the sale of the land by the United States to plaintiff, and the United States could not be estopped to sell the land by reason of any knowledge, acquiescence or consent of plaintiff in 1887 in the location or possession or working of the Phœnix location by defendants, the purchase being March 29, 1888, and subsequent to the matters alleged by way of estoppel. (*Biddleboggs* v. *Merced M. Co.*, *supra;* cited with approval *Henshaw* v. *Bissell*, 18 Wall. 271; *Martin* v. *Zellebach*, 35 Cal. 315; *Fledge* v. *Garvey*, 47 Cal. 377; *Wueth* v. *Smith*, 4 Saw. 25.)   *   *   *

There being no issue upon any material allegation of the complaint and no affirmative defense set up in the answer, it would be an idle proceeding to require a trial, there being nothing to try.   *   *   *

The complaint alleges, and the amended answer admits, that ever since the 29th day of March, 1888, plaintiff has been the owner in fee simple of the mining claim and premises described. The amended answer not only admits this, but that since the property in dispute has been patented the statutory period is five years, and by no possibility could that period be lapsed between March, 1888, and March, 1892.

The court below decided on demurrer that the five years' statute applied to patented mining claims, and notwithstanding this decision the same allegations as to this and as to the three years' statute of limitations are put in the amended answer. This decision is in accordance with the decision of the district court in the case of *Lady Bryan Company* v. *Sheppard*, and the decision in *420 Mining Company* v. *Bullion M. Co.*, 3 Saw. 634, as to the statute of limitations was as between two adverse claimants each claiming by possession alone.

The cases cited by defendant's counsel from 91 U. S. 300; 96 U. S. 530; 80 U. S. 73; 123 U. S. 209, and other cases, only support the position I have taken.

" The defenses set up in the amended answer are simply collateral attacks in an action at law upon a patent. This is never permitted. The only remedy appellants have is by an action in equity in the name of the United States against

the patentee." (129 U. S. 579; 128 U. S. 673; 121 U. S. 323; 141 U. S. 341; 14 Cal. 365; 14 Otto, 636; 21 Myers, Fed. Dec. p. 517, sec. 1805, *et seq.*; *Steele* v. *Smelting Works,* 106 U. S. 452.)

The exceptions to the rule that a patent cannot be collaterally attacked are:

1. Where the patent is absolutely void upon its face.

2. Where the patent is prohibited by statutes.

3. Where it is issued without authority.

4. Where the United States has no title to the land.

5. Where the attack is made by a party who connects himself with the title.

The allegations of the amended answer show that the defendants are strangers to the title; that they made no adverse claim to the proceedings in the land office to obtain the patent; that the officers of the land department had full jurisdiction of all matters decided by them, and that no fraud or collusion is alleged on the part of those officers.

The averments do not connect defendants in any way with the title; they do not claim or aver that they were entitled to the patent, or that the plaintiff holds the patent as trustee for them, or that the patent is void upon its face, or that it was prohibited by statute, or that it was issued without authority, or that the United States had no title.

The defendants do not bring themselves within any of the exceptions to the rule that a patent cannot be collaterally attacked. There is not a single allegation of the amended answer upon which any evidence could or would be received in any court.

Actions of officers of United States land office, judicial and not open to collateral attack. (*Smelting Co.* v. *Kemp,* 14 Otto, 640.)

No improper conduct is charged against the officers of the land office. (*Steele* v. *Smelting Co.,* 106 U. S. 453.)

The decisions of the land office cannot be collaterally attacked. (*Dahl* v. *Raunheim,* 132 U. S. 261.)

The judgment in this action gives the respondent no more than was granted it by the patent and no more than the act of congress authorized. (Rev. Stats., sec. 2322, *et seq.*)

See upon rights of patentees: Volume 19 of the Am. and Eng. Ency. of Law, VII. Patents, page 347, to IX. School Lands, p. 360; also, IV. Public Lands, p. 343, same volume.

Bigelow, J., after stating the facts:

The complaint in this action has a double aspect. It states, first, a cause of action in ejectment; and, secondly, an equitable cause of action to obtain an injunction to restrain certain trespasses threatened by the defendants. To these the answer attempts to plead, among other things, an equitable defense. Of the right of the defendants to set up an equitable defense to an action for the possession of lands there can be no question, and as to this defense the case is to be tried in the same manner and upon the same principles that would apply to an original bill in equity, brought for the same purpose. (Pom. Rem. & Rem. Rights, sec. 87, *et seq.*; *Bohall* v. *Dilla,* 114 U. S. 47, 5 Sup. Ct. 782; *Quinby* v. *Conlan,* 104 U. S. 420; *Estrada* v. *Murphy,* 19 Cal. 248, 273; *Hollinshead* v. *Simms,* 51 Cal. 158; *Treadway* v. *Wilder,* 8 Nev. 93; *Dutertree* v. *Shallenberger,* 21 Nev. 507, 34 Pac. 449; *Suessenbach* v. *Bank,* 5 Dak. 477, 41 N. W. 662.)

2. As judgment was rendered against the defendants upon the pleadings, the question is whether the answer states any defense, and I pass to a consideration of whether, in the light of equitable principles, it presents facts which entitle the defendants to defeat the action, founded, as it is, upon the legal title.

It will be noticed that when the plaintiff ceased the prosecution of its application for a patent, and abandoned the mine, it had not paid for the ground, nor obtained a final certificate of purchase from the receiver of the land office. This failure prevents it from having obtained such vested rights as relieved it from the necessity of doing the annual assessment work, and distinguishes the case from *Benson Mining Co.* v. *Alta Mining Co.,* 145 U. S. 428, 12 Sup. Ct. 877, and *Deno* v. *Griffin,* 20 Nev. 249, 20 Pac. 308, where it was held that by reason of completed patent applications and payment the requirement of doing the work no longer existed. Section 2324, Rev. Stat. U. S., provides that, until a patent issues, not less than $100 worth of labor shall be performed or improvements made upon a claim during each year, and upon failure to do so the claim shall be open to relocation in the same manner as though no location had ever been made. The courts have held a patent certificate issued upon final payment to be equivalent to a patent, but

until then abandonment, or a failure to do the annual work, subjects the claim to relocation. (Sickels, Min. Dec. 371, 384; Copp, Min. Lands, 255, 296; *Ferguson v. Mining Co.*, 18 Copp, Landowner, 242; *Mining Co. v. Gage*, 17 Copp, Landowner, 39.)

Then, by reason of this abandonment and forfeiture, the Comet became subject to relocation, and while in this condition the defendants and their grantors relocated a portion of it under the name of the "Phœnix." The answer shows that this relocation was made strictly in accordance with the mining laws, and there is no contention that it was not, in all respects, sufficient, nor that the defendants have not since fully complied with the laws in keeping up their title. Under these circumstances, up to the time the patent was issued to the plaintiff, they were vested with both the legal and equitable title to the ground as fully as it is possible to obtain such title by a location of a mine upon the mineral lands of the United States, upon which no patent has been obtained. As will be shown hereafter, in another connection, this vested in them, even as against the United States, the full beneficial ownership of the claim, which could only be lost by a failure upon their part to comply with the mining laws. Suppose that prior to the issuance of this patent to the plaintiff it had brought this action, can there be any question that it would have been decided in favor of the defendants? There can be but one answer to this, and this shows that it is only by reason of the bare legal title, obtained by this patent, that it now has any standing, even in a court of law.

Then the naked fact is that, while the defendants were the full beneficial owners of this property in accordance with the laws of the United States, without notice to them, and without their knowledge, the plaintiff has, by fraud and trickery practiced in the land office, obtained a patent therefor; and the question is whether this fraud has been so well perpetrated, and is so well intrenched in the law, that even a court of equity can afford the defendants no remedy. I am happy to say that in my judgment such is not the case, and, further, that any system of laws that would not afford a remedy under such circumstances would be unworthy a civilized people.

The publication and posting of the notices, which the

mining law requires to be made upon applications for patent, had been made long prior to the time that the defendants located the Phœnix claim. An adverse claim must be filed during the sixty days that these notices are given, and it was consequently impossible for them to file an adverse claim to the application. Their rights date from ten years subsequent to this. Had their ownership dated from any time prior to the publication of the notices, they would, of course, have been required to advertise the application in the land office, or they would have lost all right in the ground. But the law does not require impossibilities, and the fact that they did not and could not do so cuts no figure in the case. Subsequent to this, the plaintiff lost all ownership in the ground, and the defendants obtained their title; and it is upon this situation that the case must be decided.

3. Having established, at least to my own satisfaction, that previous to the patent the mine was the property of the defendants, I proceed to consider whether by reason of that patent they have lost all right therein, which can be protected by a court of equity. It is doubtful, although in my view quite immaterial, whether the plaintiff was guilty of any fraud upon the United States in the proceedings in the land office such as would justify the annulling and setting aside of the patent, in that the fact that they had done the annual labor is not one of the conditions of obtaining a patent; but this does not matter, and I shall not pause to consider it. Obtaining a patent to the defendant's mine was, under the circumstances, a positive and unequivocal fraud upon them; and, even if it were not, the answer shows such a state of facts as make the plaintiff the holder of the patent title in trust for the owners of the mine. These are that without the publication or posting of any notice of its intention so to do, and without the defendant's consent or knowledge, the plaintiff has secretly and surreptitiously obtained a patent to their property. This is entirely sufficient to require a court of equity to hold it a trustee of that title for the defendants.

This has often been decided by the courts, and the principle upon which it is done is quite clearly stated by Judge Sawyer in the case of *Lakin* v. *Mining Co.*, 11 Saw. 231, 238, 25 Fed. 337, as follows: " Where one party wrongfully obtains the legal title to land, which, in equity and good conscience,

belongs to another, whether he acts in good faith or otherwise, he will be charged in equity as a constructive trustee of the equitable owner. That, I think, is a doctrine established by the following cases: *Wilson* v. *Castro*, 31 Cal. 420; *Salmon* v. *Symonds*, 30 Cal. 301; *Bludworth* v. *Lake*, 33 Cal. 256; *Hardy* v. *Harbin*, 4 Sawy. 549—the latter being a decision of Mr. Justice Field on the circuit."

This case, while no more in point upon principle than many other decisions, is in its facts very similar to the case in hand. The defendant there had secretly and clandestinely, but without positive fraud, and without any fiduciary relation existing between the parties, by means of an old and dormant application, obtained a patent to the plaintiff's mine. Upon the ground stated in the quotation it was decreed that the defendant held this title in trust for the plaintiff, and it was compelled to convey it to him. Two cases more alike in their essential facts than that and this could scarcely be found. Of the two this is the stronger, as here actual fraud in the land office intervened.

That case was approved and the same principle affirmed in *Hunt* v. *Patchin*, 13 Sawy. 304, where the patentee of a mine was again decreed to hold the patent title in trust for the equitable owner of the property.

In *Wilson* v. *Castro*, 31 Cal. 420, it was held that where one who had a grant of land from the Mexican government died intestate, and then a person, mistakenly believing himself the heir, sold a part of the land to others, who afterwards, under the belief that they had acquired a good title, and without any fraud, obtained a confirmation of the grant and a patent from the United States, the patent did not deprive the true heirs at law of their interest in the property, but the patentees held the title in trust for them; that it did not matter whether the patentees acted in good faith and did not know that they occupied to the heirs at law the relation of trustees in equity, for the trust arose as a matter of law, and was a constructive trust. It was held, further, that the fact that the true heirs had notice of the proceedings taken by the patentees to obtain a confirmation of the grant and patent for the same, but did not intevene to protect their rights, did not destroy the trust.

In *Hardy* v. *Harbin*, 4 Sawy. 536, Justice Field said (p.

540): "The bill is filed for the purpose of having a trust declared and enforced, the complainant relying upon the established doctrine that wherever property is acquired by fraud, or under such circumstances as to render it inequitable for the holder of the legal title to retain it, a court of equity will convert him into a trustee of the party actually entitled to its beneficial enjoyment." The title involved was a United States patent, and it was again decreed to be held in trust for the true owner.

In *Sanford* v. *Sanford*, 13 Pac. Rep. 602, decided by the Supreme Court of Oregon, and subsequently affirmed by the Supreme Court of the United States (139 U. S. 642), one had by a false affidavit made in the land office obtained a patent to a piece of land upon which another had settled, and which equitably belonged to the latter; it was again decided that the patentee held the legal title in trust for the equitable owner.

In *Rector* v. *Gibbons*, III. U. S. 276, 291, the Supreme Court of the United States, speaking of the case of *Johnson* v. *Towsley*, 13 Wall. 72, said:

" The decision aptly expresses the settled doctrine of this court with reference to the action of officers of the land department, that when the legal title has passed from the United States to one party, when in equity and in good conscience, and by the laws of congress it ought to go to another, a court of equity will convert the holder into a trustee of the true owner and compel him to convey the legal title."

Nothing to the contrary was decided or even suggested in *Hamilton* v. *South Nevada G. and S. Mining Co.*, 13 Sawy. 113, and the same is true of *Smelting Company* v. *Kemp*, 104 U. S. 636, and *Steel* v. *Smelting Company*, 106 Id. 447. The two latter were both actions of law in the United States courts, where, as every lawyer knows, no equitable defense can be interposed, but must be set up by a separate action in equity. The attempt in those cases was to assail a patent collaterally, which, upon well-settled principles, it was held could not be done. The distinction between those cases and such a proceeding in equity as we are now dealing with is over and again pointed out in the opinions therein rendered by Mr. Justice Field. In *Silver* v. *Ladd*, 7 Wall. 219, 228, speaking of the equitable action, Mr. Justice Miller said:

"The relief given in this class of cases does not proceed upon the ground of annulling or setting aside the patent wrongfully issued. That would leave the title in the United States, and the plaintiff might be as far from obtaining justice as before. And it may be well doubted whether the patent can be set aside without the United States being a party to the suit. The relief granted is founded upon the theory that the title which has passed from the United States to the defendant, inured in equity to the benefit of plaintiff, and a court of chancery gives effect to this equity, according to its forms, in several ways."

The language used in *Hardy* v. *Harbin*, 4 Sawy. 536, 541, is also very much in point here. The court said: "And it is upon the confirmation and patent that the defendants rely to resist the claim of the complainants. Their position is that the confirmation inured to the benefit of the confirmee, and that the patent is conclusive evidence of the validity of their title; that it is the record of the government upon it, which cannot be questioned, except in direct proceedings instituted in the name of the government or by its authority. It is undoubtedly true that the confirmation inured to the benefit of the confirmees, so far as the legal title to the premises was concerned. It established the legal title in them, but it determined nothing as to the equitable relations between them and third parties."

This distinction is again carefully pointed out in *Sanford* v. *Sanford*, 139 U. S. 642, 646, and in *Lee* v. *Johnson*, 116 Id. 48.

In very many of the cases no fiduciary relation existed between the parties, and hence the suggestion that this is the only ground upon which a patentee can be held to be a trustee is shown to be without foundation. The true ground in such cases as this is fraud, or that "in equity and good conscience" the land belongs to another.

4. It is also argued that the defendants are not in such privity with the government title that they can contest the patent and assert their rights. I find, however, the contrary to be the law. As I have shown, the defendants were, at the time the patent issued, the owners of a mining location upon the premises in dispute, made and held in all respects in accordance with the laws. As to the effect of this location,

the court, in *Noyes* v. *Mantle*, 127 U. S. 348, 353, 8 Sup. Ct. 1132, used this language: "As said in *Belk* v. *Meagher*, 104 U. S. 279, 283: 'A mining claim perfected under the law is property in the highest sense of the term, which may be bought, sold, and conveyed, and will pass by descent.' It is not, therefore, subject to the disposal of the government." And again, in *Gwillim* v. *Donnellan*, 115 U. S. 45, 49, 5 Sup. Ct. 1110: "A valid and subsisting location of mineral lands, made and kept up in accordance with the provisions of the statutes of the United States, has the effect of a grant by the United States of the right of present and exclusive possession of the lands located. * * * To entitle the plaintiff to recover in this suit, therefore, it was incumbent on him to show that he was the owner of a valid and subsisting location of the land in dispute, superior in right to that of the defendants. His location must be one which entitles him to possession against the United States, as well as against another claimant. If it is not valid as against the one, it is not as against the other. The location is the plaintiff's title." In *Seymour* v. *Fisher*, 16 Colo. 188, 27 Pac. 240, the court said: "The locator thereof is entitled to the present possession and use as against all the world, including even the United States, which, prior to patent, retains the legal ownership." Such a title as this is amply sufficient to entitle the owner to demand that the patentee shall hold the title in trust for him. (*Sparks* v. *Pierce*, 115 U. S. 408, 6 Sup. Ct. 102; *Bohall* v. *Dilla*, 114 U. S. 47, 5 Sup. Ct. 782.) "Until the patent issued, the government held the title in trust for the locators or their vendees. * * * The entry at the United States land office, and the patent issued in pursuance thereof, was burdened with this trust, and the same may be enforced against any person claiming under the patent who can be charged with it." (*Suessenbach* v. *Bank*, 5 Dak. 477, 499, 41 N. W. 662.) The rule in such cases is well stated in *Chism* v. *Price*, 54 Ark. 251, 258, 15 S. W. 883, 1031, as follows: "A stranger or occupant without right cannot assail a patent for fraud practiced against the state; but an occupant with a right to purchase may attack a patent issued in fraud of his rights, and upon equitable terms may demand a conveyance from the patentee." *Hermocilla* v. *Hubbell*, 89 Cal. 5, 10, 26 Pac. 611, is directly in point. It was there held:

" The defendants were in possession of their claims under
locations, which were made in accordance with the law and
the local rules and customs.    They were, therefore, in privity
with the United States, and had a clear right to. contest the
patent and assert their rights."

5. It is said that the defendants' remedy is to apply to the
attorney-general of the United States to bring a bill in equity
to set aside the patent.    I shall not consider this matter.
Aside from the fact that it would be puerile to hold that the
defendants' vested rights can be made dependent upon the
discretionary action of an executive officer, there are several
answers to it, some of which are suggested in *U. S.* v. *San
Jacinto Tin Co.*, 125 U. S. 273, 8 Sup. Ct. 850.    But as I have
shown that in this proceeding they are entitled to the protec-
tion of the law, it is unnecessary to determine whether any
other course is open to them.    The case of *Railroad Co.* v.
*Cannon*, 4 C. C. A. 303, 54 Fed. 253, is not in point.    As there
stated by Hawley, J. (page 255, 54 Fed., and page 306, 4 C.
C. A.), that was " not a case where equitable relief is sought
against a party holding the legal title."    This is.    Again, the
court there held that the railroad company's rights did not
attach to the premises, if ever, until 1882, while the patent
had been issued to the defendants in 1879.    A court would
not be likely to hold that a patent was taken in trust for a
party that obtained no right in the land until two years after
it was granted.    But here the defendants' rights date from
1887, and the patent was not issued to the plaintiff for more
than a year thereafter.

6. The question as to the statute of limitation turns upon
whether the legislature intended to include patented mines
within the provisions of Gen. Stats., sec. 3632.    As originally
adopted, the section reads as follows (Stats. 1861, p. 27):
" No action for the recovery of mining claims, or for the
recovery of the possession thereof, shall be maintained unless
it appear that the plaintiff, or his assigns, was seized or
possessed of such mining claim in question within two years
before the commencement of such action."    In 1867 it was
amended to its present form, and now reads thus:    " No
action for the recovery of mining claims, or for the recovery
of the possession thereof, shall be maintained, unless it
appear that the plaintiff or those through or from whom he

claims, were seized or possessed of such mining claim, or were the owners thereof according to the laws and customs of the district embracing the same, within two years before the commencement of such action. Occupation and adverse possession of a mining claim shall consist in holding and working the same, in the usual and customary mode of holding and working similar claims in the vicinity thereof. All the provisions of this act, which apply to other real estate, so far as applicable, shall be deemed to include and apply to mining claims; *provided*, that in such application 'two years' shall be held to be the period intended whenever the term 'five years' is used; *and provided further*, that when the terms 'legal title' or 'title' are used, they shall be held to include title acquired by location or occupation, according to the usages, laws and customs of the district embracing the claim."

. The argument that the section was not intended to include patented claims is based upon the use of the term "mining claims," which, it is said, means simply a mine held under the laws and customs of miners; and upon the fact that when the section was first enacted no greater title than that could be obtained. It will be noticed, however, that when the amendment was adopted the laws of the United States did provide for obtaining a patent to a mine, and it must be supposed that the amendment was adopted with that state of facts in view. As to the meaning of the term "mining claim," the question is, of course, not what the words mean in other connections, but what they are intended to mean as used here. Had the legislature used the word "mines" in connection with, or instead of, "mining claims," there would seem to be no point to the argument; and whatever there is now is considerably weakened by the fact that those terms were then, as they still are, often used to mean the same thing. (*State* v. *Real Del Monte Gold & Silver Min. Co.*, 1 Nev. 523.)

As the section now stands it seems to provide for three kinds of ownership of a mining claim: (1) Where the claimant was seized; (2) where he was possessed; (3) where it had been held in accordance with mining laws and customs. We are not to suppose that any of these terms were needlessly used, or used without meaning; and, if not, the

word " seized " means something different from simple possession of a claim, or of a holding of it in accordance with the laws and customs of miners. If so, it must mean, as it would naturally import, an ownership in fee, for this is the only other kind of ownership known to the law. The phrase, " according to the laws and customs of the district," is not found in the original section, and must have been added because of doubts as to whether a claim so held was within the words " seized or possessed." Apparently the main purpose of the amendment was to make certain the application of the section to such claims, and that could only have been demanded by a belief that, as originally adopted, it did not apply to them, and applied only to mines held in fee, or by simple possession.

Again, the definition of what shall constitute adverse possession of mining property mentions nothing but mining claims; and, if those words were not intended to cover patented claims as well, then there is no provision as to what shall constitute an adverse holding of a patented mine—a hardly probable oversight. The same words, " seized or possessed," are used in the next section with reference to other real property, but no suggestion has ever been made that they do not apply to lands held in fee, as well as otherwise, although when adopted there was, perhaps, not a piece of patented land in the whole territory. The main reason, too, for fixing a shorter period of limitation for mines than for other property, applies as well to patented claims as to those held by other titles. Other classes of real property are comparatively stable in value, and can be used and made productive at a comparatively small expense; but not so with mines. They are often only made to " pay " by the expenditure of vast sums of money, and by this are sometimes changed from worthlessness to a value of many thousands of dollars. It is only justice that the holders of claims against this class of property should be required to assert them at an early day, to the end that they may not, in recovering their own, also reap too large a benefit from the enterprise of others. (*Oil Co.* v. *Marbury*, 91 U. S. 587, 592.)

Altogether, it seems reasonably clear that by the use of the words mentioned the legislature intended to include every kind of title by which mining property can be held.

. Judgment reversed.

Belknap, J., concurring:

Plaintiff made application to the government of the United States in the year 1876 for a mineral patent to the Comet mining claim. The matter was suffered to remain without any further proceedings until the month of March, 1888. In the meantime, and during the month of January, 1887, defendants relocated a portion of the ground under the name of the "Phœnix Claim." Thereafter, and without any further notice, save such as may have been contained in the original notice of its application, a patent was issued to the plaintiff in the month of March, 1888.

Defendants, in their answer, allege that the patent was procured by false swearing and perjury on the part of plaintiff's witnesses in making the final proof of labor done and improvements made before the register and receiver. This fact, coupled with a strict compliance with the mining laws on their part, and an abandonment by plaintiff, entitles the defendants, it is claimed, to a decree in their favor as equitable owners of so much of the mining claim as conflicts with their claim.

Congress has provided the manner in which the government title to the mineral lands may be acquired. Section 2318, Rev. Stats., declares that "in all cases, lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." Section 2325: "Any person who has complied with all the requirements of the law may file in the proper land office an application for patent under oath showing such compliance, together with other matters required by the statute, but unnecessary to be mentioned here. Upon the filing of the application and such other papers as the statute directs, the register of the land office is required to publish a notice that the application has been made, for the period of sixty days, in some newspaper to be by him designated, as published nearest to the claim, and he must also post a similar notice for the same time in his own office. If no adverse claim shall have been filed with the register and receiver of the proper land office at the expiration of the sixty days of publication it shall be assumed that the applicant is entitled to a patent upon the payment to the proper officer of five dollars per acre, and that no adverse claim exists; and thereafter no objection from third persons

to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of this chapter." Section 2326: "It shall be the duty of the adverse 'claimant, within the thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction, to determine the question of the right of possession, and prosecute the same with reasonable diligence to final judgment, and a failure so to do shall be a waiver of his adverse claim. After such judgment shall have been rendered, the party entitled to the possession of the claim, or any portion thereof, may, without giving further notice, file a certified copy of the judgment roll with the register of the land office, together with the certificate of the surveyor-general that the requisite amount of labor has been expended or improvements made thereon, and the description required in other cases, and shall pay to the receiver five dollars per acre for his claim, together with the proper fees, whereupon the whole proceedings and the judgment roll shall be certified by the register to the commissioner of the general land office, and a patent shall issue thereon for the claim, or such portion thereof as the applicant shall appear, from the decision of the court, to rightfully possess. If it appears, from the decision of the court, that several parties are entitled to separate and different portions of the claim, each party may pay for his portion of the claim, with the proper fees, and file the certificate and description by the surveyor-general, whereupon the register shall certify the proceedings and judgment roll to the commissioner of the general·land office, as in the preceding case, and patents shall issue to the several parties according to their respective rights."

No title from the government to the mineral lands can be acquired in any other way than as prescribed by this statute. The parties claim by separate rights. No fiduciary relation exists between them, and no protest was made against the issuance of the plaintiff's patent. If the plaintiff has acquired the title contrary to the terms of the statute, the facts can be shown, and the patent annulled in a proper proceeding. Relief in such cases is expressly provided in section 2325 of the foregoing act. But until the patent has been got out of the way, and proceedings instituted to determine the validity

of the title of the defendants, no relief upon this part of the case can be afforded them.

It does not follow that the defendants are entitled to the patent, conceding all of the allegations in their answer to be true. According to it, the plaintiff has failed to comply with the terms of the statute in the matter of expenditures required (Rev. Stats., sec. 2324), and the patent for this cause may be annulled. But the defendants are not in a position to acquire the government title. They are neither applicants for patent nor protestants under the statute. They have not complied with the requirements of the foregoing statute in that regard, and submitted their claim to adjudication, and in a court of competent jurisdiction, and had their rights ascertained and determined. The statute is not restrictive in its operation, as the defendants appear to have assumed, but all claimants to the ground in question are embraced in its provisions, and are required to present their claims for adjudication in the local courts; and a failure to do so will be a waiver of the adverse claim. It follows, upon the facts presented, that the patent cannot be attacked in this proceeding.

Upon the question of the statutes of limitations, I am of opinion that two years is the time fixed for such actions.

Murphy, C. J., dissenting:

This is an action of ejectment brought by the South End Mining Company, in the district court in and for Lyon county, for a mining claim situated in the Devil's Gate and Chinatown mining district, Lyon county, Nevada, being 400 feet in width and 1,100 feet in length.

The complaint is in the ordinary form in ejectment, coupled with a prayer for an injunction and $500 damages, and alleges that on the —— day of March, 1888, the plaintiff was and is now the owner in fee simple of the ground in controversy.

To this complaint the defendants answered, setting up general denials, and pleading affirmative matter.

They deny that on the 29th day of March, 1888, the plaintiff was or now is the owner, in fee simple or othewise, or was in the possession, or entitled to the possession, of the mining claim or ledge described in the complaint.

They· admit that the plaintiff purchased the mining ground described in the complaint from the United States of America on the 29th day of March, 1888, and acquired the legal title on that day, but allege that such title was illegal, fraudulent, and void.

They assign the following acts of plaintiff, constituting such illegality and fraud:

"The defendants, further answering, aver that on the —— day of ——, 1876, the plaintiff's grantors applied to the register and receiver of the United States land office at Carson City, Nev., for a patent for the Comet mining claim and lode, alleged to have been located on the 27th day of August, 1872; * * * said notice claiming 1,500 feet of the quartz lode, being a relocation of the Dorrence, with all its dips, spurs and variations, together with all dumping grounds and dumping privileges, and the lawful 200 feet on each side of the ledge. That afterwards, and on or about the —— day of ——, 1878, and until on or about the —— day of April, 1888, the said plaintiff abandoned the said application for patent and ceased to prosecute the same, and abandoned said mining claim and location, and ceased to occupy or possess the same, or to prosecute the business of mining thereon, or to keep up the monuments marking the boundaries thereof, or to do or perform any work or labor thereon, and failed and neglected to do or perform the annual labor or make the annual improvements required by the mining laws of the United States, and wholly failed and neglected to comply with the .conditions of the mining laws of the United States necessary·to preserve the said location, and forfeited the same; and by reason of the premises the said Comet location and mining ground applied for, as hereinbefore stated, was subject to relocation, and during said period of time said Comet ledge was relocated, and was claimed, held and occupied under said relocation, adversely to the plaintiff, for the period of more than five years.

"And defendants aver that during said period, and on, to wit, January 5, 1887, said grantors of the defendants entered and located said Phoenix mining claim, lode and location; the same being then unoccupied public mineral lands of the United States, and subject to location. Defendants, further answering, aver, that on or about the 13th day of April,

1888, the said persons relocating the said Comet lode dis-
covered ore thereon, and commenced extracting the same,
and that after such discovery said plaintiff reorganized, and
resumed the prosecution of its application for patent, and
without the knowledge of defendants or their grantors, and
without posting or publishing any other or further notice of
application for patent, procured the said register and receiver
to sell said Comet mining claim to plaintiff, and to issue a
certificate of purchase thereof; and in order to induce the
said register and receiver to accept payment and issue said
certificate of purchase, and for the purpose of inducing the
government of the United States to sell and patent said
mining claim to plaintiff, procured, and caused to be pre-
sented to and filed in the office of said register and receiver
of the United States land office, false and fraudulent
affidavits and testimony showing and tending to show
that the annual labor and improvements had been made
by plaintiff upon the said Comet mining claim and location
between the date of location, to wit, 1872, and the date of
such proof and certificate of purchase; said plaintiff well
knowing that said affidavits and proofs were false and
fraudulent, and well knowing that said plaintiff had
abandoned said location, and had failed and neglected to do
the annual labor or make the annual improvements upon
the said location for or during the years from 1879 to 1887,
inclusive, and each of them."

The defendants aver that the Comet location is a reloca-
tion of the Dorrence mine, and is shown by cuts and exca-
vations on the ground; that the Phœnix ledge located by the
grantors of the defendants is within the surface ground
described in the patent to the plaintiff, but deny that it is
the ledge located by the plaintiff's grantors, and is not the
ledge applied for by the plaintiff, and its top or apex is more
than 300 feet from the center of the Comet ledge. And they
aver that the Comet ledge, on its horizontal course and on its
strike, crosses the east side line of the plaintiff's location and
claim, as described in its patent, at a point 650 feet from the
northerly end of the Phœnix ledge of the defendants.

The defendants plead the statute of limitation and title
by prescription, and aver that, they having expended $6,000
in labor and improvements on the ground, to the knowledge

of the plaintiff, the plaintiff is now estopped to assert his title.

The plaintiff demurred to this answer on the ground that the facts therein stated did not constitute a defense to the action, and asked for judgment on the pleadings, on the ground that the answer admitted the ownership of the plaintiff to the ground in controversy by its patent, and that the defendants were not in a position to attack said patent, they not having connected themselves with the government title.

The district court sustained the motion, and judgment was entered in favor of the plaintiff without damages, and this appeal is from the judgment.

There is no dispute as to the sufficiency of the location of. the Comet ledge in 1872. There is no controversy as to the proceedings taken to procure the patent, from the time of. making the application up to and including the publication of the notice of such application. But the appellants contend that by reason of the fact that the respondent allowed such a length of time to elapse between the expiration of the publication of application for patent and the final proof and payment for the land, coupled with the fact that the plaintiff failed and neglected to do the assessment work or make improvements in each year as required by act of congress, forfeited whatever rights it had to the ground in dispute; and the defendants' grantors having entered upon the ground in 1887, and relocated the same, they are in a position to attack said patent, and have the same set aside, as being absolutely void. It is admitted by the answer that all of the defendants' works, and the top or apex of the Phœnix ledge at the point of discovery, are within the surface boundaries of the Comet patented ground.

In the year 1866, and as amended in 1872, congress, by statute, conferred upon citizens of the United States, and those who had declared their intentions to become such, the right to locate and hold mining claims, so long as they complied with the acts of congress and the local rules and regulations of the miners in the mining district. These statutes gave to the locators the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges throughout

Murphy, C. J., dissenting.

their entire depth, the top or apex of which lies inside of the surface lines, extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular, in their course downward, as to extend outside the vertical side lines of such surface location. (Rev. Stats. U. S., sec. 2322.)

This possessory right often is of great value, and may be sold, transferred or mortgaged. The locator has the right to explore and extract the minerals therefrom without being required to purchase the government title thereto. He is not compelled to do so. Under his possessory right, he can hold as against everybody except the government of the United States. (*Forbes* v. *Gracey*, 94 U. S. 766.)

The public mineral land is at the disposal of the federal government; and although individuals may locate and acquire a possessory right to enter upon the unoccupied mineral lands, and extract the valuable ores and minerals therefrom, yet all such rights so acquired are subject to the paramount title of the government. Congress has provided that the locator or his grantors may purchase the mineral land, and has prescribed the terms and conditions upon which the government title may be acquired. Congress has also created a branch of the executive department of the government, before which all matters pertaining to the issuance of patents to mining claims are heard and determined. The land department of the government is a special tribunal created for the purpose of hearing and determining the rights of parties to purchase land, and, within the scope of its jurisdiction, its adjudications are final and conclusive. (*Smelting Co.* v. *Kemp*, 104 U. S. 639; *Wight* v. *Dubois*, 21 Fed. 693; *Ferry* v. *Street*, (Utah), 11 Pac. 576; *Jeffords* v. *Hine*, (Ariz.), Id. 352; *Johnson* v. *Towsley*, 13 Wall. 80; *Talbott* v. *King*, (Mont.), 9 Pac. 434.)

In the case of *Steele* v. *Refining Co.*, 106 U. S. 450, 1 Sup. Ct. 389, Mr. Justice Field, speaking for the court, said: "We have so often had occasion to speak of the land department, the object of its creation, and the powers it possessed in the alienation by patent of portions of the public lands, that it creates an unpleasant surprise to find that counsel, in discussing the effect to be given to the action of that department, overlook our decisions on the subject. That

department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of the title from the United States to a portion of the public domain is obtained, and to see that the requirements of different acts of congress are fully complied with. Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its annullment or limitation." (*Quinby* v. *Conlan,* 104 U. S. 426; *Moore* v. *Robbins,* 96 U. S. 532; *Shepley* v. *Cowan,* 91 U. S. 340; *Marquez* v. *Frisbie,* 101 U. S. 476; *Beard* v. *Federy,* 3 Wall. 491; *French* v. *Fyan,* 93 U. S. 170.)

It is insisted on the part of appellants that they having alleged in their answer that the plaintiff committed a fraud on the defendants, by reason of false affidavits having been submitted to the register and receiver of the United States land office to establish the fact that the assessment work had been done on the claim in each year, as required by the mining laws, when in fact it had not, it is a direct attack, as to the validity of the patent, and constitutes a good defense in equity to the plaintiff's action; and their counsel contends that under the pleadings in this case the court can go behind the patent, and inquire into the regularity of the proceedings, the sufficiency and character of the evidence submitted on said application for a patent, and that the defendants should be permitted to introduce testimony before the court to con‑ tradict the statements set forth in the affidavits, the sufficiency of which has already been passed upon by the register and receiver before issuing the final certificate or receipt for money received in payment for the land. Under our system of practice, equitable defenses of this nature, as well as defenses at law, may be interposed in an action of ejectment. The answer, when presenting them, is in its nature a bill in equity, and must contain all its essential allegations. It must disclose a case which, if established, will justify a decree adjudging that the title be transferred to the defendants, or enjoining the further prosecution of the action.

There are cases, and quite a number of them, where courts of law, as well as in equity, have permitted litigants to go

behind the patent, and inquire into the proceedings had before the land department. In such cases the party attempting to impeach the patent must show that he has a title to the premises, or such an interest therein, in subordination to the title, wherever it may lie, as will authorize him to call the true title to his aid, or where the United States or a state had issued their patents to lands over or to which they had no control or title at the date of the issuance of the patents, by reason of the fact that the law did not authorize the selling of the lands, or that they had been reserved from sale, or had been previously transferred to others, as where swamp and overflowed lands were donated to the state by the act of congress, a patent issued thereafter by the United States is void. Why? Because the government has been divested of the title thereto. (*Railroad Co.* v. *McCusker*, 67 Cal. 67, 7 Pac. 122; *Kile* v. *Tubbs*, 59 Cal. 191; *Hermocilla* v. *Hubbell*, 89 Cal. 5, 26 Pac. 611.)

A United States patent for land included within the limits of a Mexican grant is void, the government having no title. (*Carr* v. *Quigly*, 57 Cal. 394; *Newhall* v. *Sanger*, 92 U. S. 761.)

Where the State of California issued its patent for land once the bed of a navigable stream, but which had never been acquired as swamp and overflowed land from the United States, the patent was held to be void. (*Edwards* v. *Rolley*, (Cal.) 31 Pac. 267.)

In establishing the facts as set forth in the above or similar cases, the proceedings of the land department ·upon matters properly before it are not called in question, but its authority to act at all is denied, by reason of the fact that the government or the state had no title to convey. (*Smelting Co.* v. *Kemp, supra.*) There is no such question involved in this case. It is admitted by the answer that the land was open to sale; that the paramount title was in the United States, and that such title was transferred by the government to the plaintiff in the month of March, 1888; and that the plaintiff is now the owner of the legal title to the premises in controversy. It does not appear from the answer that the defendants have attempted, or ever will attempt, to connect themselves with the government title; nor are there any averments in their pleadings that would justify a court in holding that the plaintiff is trustee for them, and that the legal

title must be transferred to them by the plaintiff; nor can we, under the pleadings, enjoin the prosecution of the action. The mere occupation of the defendants is worthless, when opposed to the government title.

In the case of *Courchaine* v. *Mining Co.*, 4 Nev. 374, Lewis, J., speaking for the court, said:

"The public land is absolutely at the disposal of the federal government. Although individuals may settle upon and occupy portions of it, no title is acquired thereby which will be available against the paramount right of the government. As between each other, settlers may acquire rights which the courts will maintain and enforce. Thus, the first possessor is always deemed to have the best right, and by establishing priority of possession he is allowed to recover in ejectment, and in fact he is treated as the absolute owner of the land occupied by him. But all rights so acquired are subject to the paramount title of the government. Occupation and priority of possession are utterly worthless, when opposed to a title or right of possession expressly conferred by the proper federal authorities. As between persons none of whom claim title from the government, nor can show a right of possession recognized by it, priority of possession must prevail. When, however, the government has declared, or by its proper tribunals decided, that a particular person is entitled to the possession, such declaration or decision, in the absence of fraud, is high evidence of his right to such possession; certainly, superior to that which is acquired simply by priority of possession unaccompanied with any recognition from the government." (*Frisbie* v. *Whitney*, 9 Wall. 194; *The Yosemite Valley Case*, 15 Wall. 86; *Shepley* v. *Cowan*, 91 U. S. 331; *Oaksmith* v. *Johnston*, 92 U. S. 346.)

Courts have universally held that, after land is once offered for sale by the government, the party who takes the initiatory step in such cases, if followed up to patent, is deemed to have acquired the better right as against others to the premises, for the reason that when the patent issues it relates back to the date of the initiatory act, and cuts off all intervening claims. (*Eureka Con. Min. Co.* v. *Richmond Min. Co.*, 4 Sawy. 317; *Shepley* v. *Cowan*, 91 U. S. 337; *Talbott* v. *King*, (Mont.) 9 Pac. 439; *Deffeback* v. *Hawke*, 115 U. S. 405, 6 Sup. Ct. 95.)

The rule which prohibits courts from going behind the patents, and inquiring into the proceedings had before the land department, when the controversy is between the holder of the legal title and a party claiming by occupation only, is derived from the provisions of the statutes of the United States, which prescribes the filing of adverse claims. Where a statute prescribes one way in which a thing shall be done, it precludes every other. The plaintiff having made application for a patent to the Comet mining claim, the defendants, claiming to have relocated a portion of the ground, had but one method open to them to protect their interest, if they had any, and have their rights determined. The statute, after limiting the time within which an adverse claim may be filed, provides: "Thereafter no objections from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of this chapter. (Sec. 2325, Rev. Stats. U. S.)

From the date of filing of the application for a patent by the plaintiff to the land in dispute, it ceased to belong to the public domain. No other claim to the same land could be asserted, except in the manner pointed out by the statute. We do not understand defendants to deny but what the plaintiff and its grantors complied with the mining laws, local rules, regulations, and customs of the miners within the district from the date of location of the Comet ledge and claim until and including the date of the expiration of the publication of the notice of application for its patent; but what they do claim is that after such publication had been completed the plaintiff abandoned the claim, and failed to do the assessment work, until 1888, when it resumed work, and, without giving any further or additional notice of its intentions, applied at the United States land office, made proof of having done the assessment work, by means of false affidavits, paid five dollars an acre for the land, received the receiver's receipt, and upon such proof and receipt the patent was issued. And the defendants claim that after said abandonment, and before said proof and payment, their grantors entered upon and relocated a portion of said surface location of the Comet claim.

The proceedings on application for a patent to land, before the land department, from the initiatory step until the issu-

ance of the patent, are *ex parte*, unless an adverse claim be filed; and if an adverse claim is filed, in mineral applications, it is referred to the courts, and in all other cases they are heard and determined in the land department. But we know of no law, rule or regulation of the land department that requires of a party applying for a patent to mineral land to give or publish any additional notice after the expiration of the sixty-days publication. After such publication the applicant can make what is termed his "final proof," which consists of the affidavit of the publisher or manager of the paper that the notice has been published therein for sixty days; of the applicant himself, or his agent, that the plat and notice remained posted upon the claim during the period of publication; of two disinterested persons, that the $100 worth of labor or improvements were performed or made on the claim during the year in which the final proof was made. If no adverse claim was filed prior to this proof submitted to the register and receiver, it shall be assumed that the applicant is entitled to a patent upon the payment to the proper officers of five dollars per acre, and that no adverse claim exists.

By act of congress, March 3, 1849 (Rev. Stats., sec. 441) the secretary of the interior was charged with the supervision of public business relating to the following subjects: "Second. The public lands including mines." By section 453, the office of commissioner of the land department was created, and that officer was to perform his duties under the direction of the secretary of the interior, and, as hereinbefore stated, that department being vested with the supervision and sale of the mineral land, the decisions and rulings of the officers of the land department, made within the scope of their authority, on questions of fact, are conclusive everywhere; and when a party relies upon a relocation made subsequent to publication, and prior to final proof and payment, the only course for him to pursue is by presenting his grievance in the shape of a protest, setting forth the fact that the applicant for the patent had not complied with the law, by reason of its failure to do the assessment work or make the improvements, which protest should be filed in the land office, and a hearing demanded, which would be granted, as was said by Acting Commissioner Holcomb in the appeal

case of *Wheeler* v. *Sanger*, under date of October 21, 1880 (Sickels, Min. Dec., at page 275): " I am also of the opinion that all adverse claims, from whatever source derived, should be presented in the manner prescribed by law, and during the period of publication of notice of application for patent, with a single exception, to wit:   Should the abandonment occur subsequent to such publication, and prior to entry and payment, a case would be presented by which the executive department would be compelled to take jurisdiction, because the law, under that state of facts, allows the abandoned ground to be again located by any qualified person in the same manner as if no location of the same had ever been, and makes no provision for the determination elsewhere of any question or controversy arising out of this class of conflicting claims."

This instruction was given to the local land office in 1880, and the same has been followed and approved in the following cases, and by the following officers:    *Bodie Tunnel & Min. Co.,* v. *Bechtel Consol. Min. Co.,* 1 Dec. Dep. Int. 599—letter of Secretary Kirkwood to Commissioner McFarland, December 12, 1881, in which he says: " I desire to say that, while I am of the opinion that controversies between adverse mining claimants cannot be heard and determined before this department, I am nevertheless of the opinion that where, under the last clause of sec. 2325, third parties present evidence by affidavits, etc., to show that an applicant has failed to comply with the mining statutes, if the evidence is of such character as to entitle it to credit, and if the allegations are such as, if proven in regular proceedings, would show that the law has not been complied with, that patent under the law ought not to be issued, or that you have no jurisdiction to issue the patent, then it is your duty to order an investigation as between the government and the applicant, as in similar cases of agricultural entries."   Secretary Vilas to Commissioner Stockslager, January 25, 1889, in the case of *Bright* v. *Mining Co.,* 8 Dec. Dep. Int. 122.    Secretary Noble to the commissioner of the general land office, November 4, 1889, *Tangerman* v. *Mining Co.,* 9 Dec. Den. Int. 538. And by the same secretary to the same officer in the case of *Sweeney* v. *Wilson*, under date of February 13, 1890, in which the land department canceled an application for a patent on

the ground that the applicant had not complied with the law (10 Dec. Dep. Int. 157). First Assistant Secretary Chandler to the commissioner of the general land office, under date of May 2, 1890, in the case of *Mining Co.* v. *Gage*, in which the secretary orders a hearing to determine as to whether the ground in controversy was subject to relocation pending adverse proceedings and application for patent (10 Dec. Dep. Int. 534). *Nichols* v. *Becker*, 11 Dec. Dep. Int. 8. Copp, Min. Lands, 315. *Bellwither Lode*, Id. 133.

In the case of *St. Lawrence Min. Co.* v. *Albion Min. Co.*, 10 Copp., Landowner, 51, Commissioner McFarland, writing to the register and receiver of the land office at Eureka, said: "The protest of the Richmond Mining Company is deemed sufficient to authorize a hearing to ascertain whether or not the survey of the Albion, No. 1, corresponds with the location of the claim, and the only question to be considered is whether such a hearing should be ordered while action on the application for patent is suspended on account of the suit pending in court on the adverse claim. The subject matter of the protest appears not to be in any way involved in the suit, and it relates solely to questions of non-compliance with the law by the applicant in his proceedings for patent. If the protest is true, a portion of the land was not subject to the application for patent, and that is a question for this office, and it can be investigated and determined without regard to the pending suit. The proceedings which are required by law to be suspended are those relating to the patenting of the claim, and this office is not barred by the filing of an adverse claim from investigating the collateral fact as to whether the application embraces land not subject to the same. Such action has no tendency to advance the application for patent, nor to interfere in any way with the matters properly referred to the court. You will accordingly order a hearing to determine the truth or falsity of the allegations in the Richmond Mining Company's protest."

Section 2450, Rev. Stats. U. S., creates the board of equitable adjudication, consisting of the secretary of the interior, the attorney-general and the commissioner of the general land office, who are authorized to decide, upon principles of equity and justice as recognized in courts of equity, and in accordance with regulations to be settled by the secretary of

the interior, all cases of suspended entries of public lands, and to adjudge in what cases patents shall issue upon the same. Section 2456 provides: "Where patents have been. already issued on entries which are confirmed by the officers who are constituted the board of adjudication, the commissioner of the general land office, upon the canceling of the outstanding patent, is authorized to issue a new patent, on such confirmation, to the person who made the entry, his heirs or assigns."

In the case of *Omaha Quartz Mine* (on appeal), Copp, Min. Lands, 198, and the letter of Commissioner McFarland to the register and receiver at Central City, Colo., Id. 317, pro- tests were filed against the issuance of patents on the ground that the notices were not published in the newspapers nearest the mines, and the law had not been complied with. In each case it was held that the questions were such as called for the interposition of the board of equitable adjudication. For any causes existing prior to the date of an application for a patent the party claiming any rights adverse to the applicant must file his adverse claim before the sixty-days publication expires, and within thirty days thereafter he shall commence his proceedings in a court of competent jurisdiction for the recovery of the claim. But for failure to comply with the law, such as failure to post or publish the notice or do the assessment work as required by law, it then becomes a controversy between the United States and the applicant only, the question being as to compliance on their part with the prerequisite conditions of the law. (*Petit* v. *Mining Co.*, 9 Dec. Dep. Int. 565.) And he who has acquired any rights after the application for patent has been made must apply to the land department for a protection of the same.

From the averments in the answer, the defendants were in a position to file a protest in the United States land office, at Carson City, after they had located the Phœnix claim, and before the plaintiff had offered its final proof and payment. They allege that their grantors entered upon and located the claim in the month of January, 1887; that the plaintiff did not do the assessment work, nor make any improvements on. the claim, from 1878 until the month of April, 1888; they had one year in which to file a protest against the plaintiff's right to further prosecute its application for patent. If the allega-

tions contained within the answer are true, the defendants had a right to say to the officers of the land department that the applicant had not complied with the terms of the statute, and demand an investigation, and show, if they could, that the plaintiff had not complied with the law. It is not a valid excuse for them to say that the plaintiff gave no additional notice as to when it would make final proof and payment. It was not required to do so, and an examination of the files in the United States land office in Carson City would satisfy the defendants that the application of the plaintiff for patent was filed and pending therein. They not having filed their protest, they are not in a position to attack the patent now.

In *Knight* v. *Association*, 142 U. S. 176, 12 Sup. Ct. 258, the supervisory power of the secretary of the interior over all matters relating to the sale and disposition of the public lands, and the issuing of patents thereon, was fully considered, and numerous authorities cited. It is therein declared by Mr. Justice Lamar, speaking for the court, that the secretary was clothed with plenary authority as the supervising agent of the government to do justice to all claimants, and to preserve the rights of the people of the United States, and that he could exercise such supervision by direct orders or by review on appeal, and, in the absence of statutory directions, prescribe the mode in which it could be exercised by such rules and regulations as he might adopt.

In the case of *Doe* v. *Mining Co.*, 54 Fed. 946, an attempt was made to go behind the patent, and show that the end lines of the Silver King location were not parallel. Judge Ross, in passing upon this question, said: "If the rights conferred by the patent can be defeated by showing a want of parallelism of the end lines in the original location, it is difficult to understand why the patent may not likewise be defeated by showing that the original location was void because its boundaries were not properly marked upon the ground, or because no vein, lode or ledge was discovered within them, or because the statutory requirement in respect to the posting of the notice of location was not complied with, or because of an omission on the part of the locator to comply with any other provision of the statute regarding the location of such lode claims. All such matters I understand to be absolutely concluded by the patent, so long as it stands

unrevoked. If questions relating to the boundaries of the location; the marking of them; the discovery of a vein, lode or ledge within them; the posting of the required notice, etc., are open to contestation after the issuance of a patent for the claim, as before, the issuance of such an instrument would be a vain act, and would wholly fail to secure to the patentee the rights and privileges designed by the law authorizing its issue. The very purpose of the patent is to do away with the necessity of going back to the facts upon which it is based. Authorities to this effect, in both federal and state courts, are so numerous as to render it, I think, unnecessary to cite them."

In *Smelting Co.* v. *Kemp*, 104 U. S. 639, on the trial of the case the plaintiff introduced the patent and its record title, and rested its case. The court permitted the defendant to introduce in evidence a certified copy of the record of proceedings in the general land office at Washington, upon which Starr obtained his patent. "The plaintiff objected to the introduction of the paper on the ground that it could only show, or tend to show, the regularity or irregularity of the proceedings before the executive department in obtaining the patent or the validity or invalidity of the possessory title or pre-emption right upon which the patent was founded, and that no evidence could be introduced to impeach the patent, or attack it collaterally, or in any way affect it in the action."

In passing upon this ruling, Justice Field, speaking for a majority of the court, after holding that the actions or decisions of the officers of the land department could not be assailed, at page 641, said: "It is this unassailable character which gives to it [the patent] its chief, indeed its only value, as a means of quieting its possessor in the enjoyment of the land it embraces. If intruders upon them could compel him, in every suit for possession, to establish the validity of the action of the land department, and correctness of its rulings upon matters submitted to it, the patent, instead of being a means of peace and security, would subject his rights to constant and ruinous litigation. He would recover one portion of his land, if the jury was satisfied that the evidence produced justified the action of the department, and lose another portion, the title whereto rests upon the

same facts, because another jury came to a different conclusion. So his rights in different suits upon the same patent would be determined, not by its efficacy as a conveyance of the government, but according to the fluctuating prejudices of different jurymen, or their varying capacities to weigh the evidence." (*Moore* v. *Wilkinson*, 13 Cal. 478; *Beard* v. *Federy*, 3 Wall. 492.)

And at page 647 of the same report the judge says: "According to the doctrine thus expressed, and the cases cited in its support (and there are none in conflict with it), there can be no doubt that the court below erred in admitting the record of the proceedings upon which the patent was issued, in order to impeach its validity. The judgment of the department upon their sufficiency was not, as already stated, open to contestation. If, in issuing a patent, its officers took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved. He must resort to a court of equity for relief, and even then his complaint cannot be heard unless he connects himself with the original source of title, so as to be able to aver that his rights are injuriously affected by the existence of the patent; and he must possess such equities as will control the legal title in the plaintiff's hands. (*Boggs* v. *Mining Co.*, 14 Cal. 279; *Chapman* v. *Quinn*, 56 Cal. 274). It does not lie in the mouth of a stranger to the title to complain of the acts of the government with respect to it. If the government is dissatisfied, it can, on its own account, authorize proceedings to vacate the patent or limit its operations."

*Wight* v. *Dubois*, 21 Fed. 693, was a bill in equity to set aside a patent to a mining claim. Brewer, J., on petition for rehearing, said: "The government, as the original owner, offers the title to these mineral lands, upon certain conditions, to whomsoever discovers mineral. The amount of land it will convey to each locator is limited, and certain forms of procedure are prescribed, but the primal fact is that the lands are offered to those who discover the mineral. In this matter the government resembles a private land owner, who makes an offer to sell his lands upon specified conditions. When the patent issues, the title passes from the

Murphy, C. J., dissenting.

government, and no one can question that title who has not, prior thereto, by compliance with the conditions prescribed by the government, himself acquired an interest in the land. It matters not what wrong the patentee may have perpetrated upon the government; it, and it alone, can complain. In other words, when grantor and grantee are satisfied, a stranger has nothing to say." (*Field* v. *Seabury*, 19, How. 330.)

In the case of *Steele* v. *Refining Co.*, 106 U. S. 453, 1 Sup. Ct. 389, the answer charged that bribery and subornation of perjury were committed by Starr in inducing parties to make false affidavits respecting the claim patented by the land department. The perjury consisted in Starr's affidavit as to his citizenship, and the possession and working, by himself or grantors, of the claim for which the patent was issued. That false and perjured testimony was used to influence the officers of the land department. There was no allegation of improper conduct on the part of the officers. At page 457, 106 U. S., and page 389, 1 Sup. Ct., the court, in passing upon the question of fraud, said: "Though the various matters of fraud, perjury, and subornation of perjury, alleged as a defense, are to be taken as true for the purposes of this decision, they are not to be taken as true for any other purpose. What we decide is that, if true, they are not available in this form of action, and that any relief against the patent founded upon them must be sought in another way, and by a direct proceeding."

See, also, the opinion of Justice Hawley in the case of *Railroad Co.* v. *Cannon*, 4 C. C. A. 303, 54 Fed. 253, and authorities therein cited; *Turner* v. *Donnelly*, 70 Cal. 604, 12 Pac. 469.

It seems to us that the above decisions are directly in point on the question under consideration in the case at bar.

The allegation charging fraud in this answer is "that, in order to induce the register and receiver to sell said mining claim, and issue their receipt for the payment of the land, and to induce the government of the United States to sell and patent said mining claim to plaintiff, the said plaintiff procured, and caused to be procured, and filed in the office of the register and receiver, false and fraudulent affidavits and testimony showing, and tending to show, that the assessment work had been done from the year 1879, to and including the

year 1887, when in fact the plaintiff well knew it had not been done."

It does not charge any officer of the land department with being guilty of fraud, nor that they colluded or connived with the plaintiff in any manner in the procurement of said patent, and, if a fraud was perpetrated, it was against the government. Such being the case, the United States is the only one that can ask to have the patent set aside. The patent is not void, admitting that everything stated in the answer be true. It is merely voidable; and, it having been issued to the plaintiff, there can be no higher evidence of title, and, in favor of the validity and integrity of such an instrument, we must presume that all antecedent steps necessary to its issuance were duly taken.

It being admitted by the answer that the paramount title was in the United States, and that that title was transferred to the plaintiff by the department of government authorized by law to transfer its title by patent, the presumption is that the plaintiff is entitled to the possession, as well as to the whole beneficial interest; and, as the grantee of the government—the plaintiff—takes and holds whatever interest therein the government could grant, subject to no conditions other than those expressed in the patent, and no person, company, or association claiming in his, their, or its own right any interest in the lands can legally prevent the patentee from entering, under and by virtue of its patent. The mere entry and claim of relocation of a part of the Comet claim by the defendants or their grantors did not give them a vested or an absolute estate as against the United States, nor one which the government might not impose additional duties upon, or take away from them entirely. (*The Yosemite Valley Case,* 15 Wall. 86.)

It was not sufficient for the defendants to have alleged in their answer that the plaintiff was not entitled to the patent. The government was satisfied with the proofs submitted by the plaintiff, and received its five dollars an acre, and issued its patent for the land, and into the *bona fides* of this transaction no one but the government can inquire.

In *Wright* v. *Dubois, supra,* it is said: "The government, as a landowner, offers its lands for sale upon certain prescribed conditions, compliance with which is a matter of set-

tlement between the owner and purchaser alone, and with which no stranger to the title can interfere. Publication of notice is process bringing all adverse claimants into court, and, if no adverse claims are presented, it is conclusively presumed that none exist, and that no third parties have any rights or equities in the land. Thereafter, the only right or privilege remaining to any third parties is that of protest or objections filed with the land department, and cognizable only there. If sustained by the department, the proceedings had by the applicant are set aside; if overruled, the protestant or objector is without further right or remedy." (*Land Co.* v. *Griffey,* 143 U. S. 41, 12 Sup. Ct. 362; *Lee* v. *Johnson,* 116 U. S. 48, 6 Sup. Ct. 249; *Sparks* v. *Pierce,* 115 U. S. 411, 6 Sup. Ct. 102; *Gwillim* v. *Donnellan,* 115 U. S. 50, 5 Sup. Ct. 1110; *Deffeback* v. *Hawke,* 115 U. S. 405, 6 Sup. Ct. 95; *Bohall* v. *Dilla,* 114 U. S. 50, 5 Sup. Ct. 782; *Smelting Co.* v. *Kemp, supra; Lee* v. *Stahl,* 9 Colo. 210, 11 Pac. 77; *Hamilton* v. *Mining Co.,* 33 Fed. 565; *Chapman* v. *Quinn,* 56 Cal. 274.)

In their anwswer the defendants allege that their grantors relocated a portion of the Comet claim in the month of January, 1887.

If the Comet claim was abandoned at that time, the relocation thereof by the defendants' grantors entitled them to the exclusive possession and use thereof, as against everybody except the United States, which, prior to patent, is the owner of the legal title.

The different statutes providing for the location and patenting of mining claims are to be considered together, and the laws giving the miner certain rights to mining claims which he has located in compliance therewith must be construed in connection with the adverse provisions treated of in several enactments.

The locator's claim by right of possession is the lowest grade of title known to the mining laws. Under such a right the locator cannot assert or claim any title as against the government. The government merely recognizes his right to remain in possession so long as he complies with the rules and regulations which congress may prescribe. The equitable title accrues to the applicant upon entry and purchase at the United States land office. Still, the legal title is in the government, and the applicant may be deprived of his

equitable title if it can be shown that he has not complied with the law; and that showing must be made before the officers of the land department before the patent issues. Title in fee simple is acquired on delivery of patent, evidencing the legal title, and, when the patent is issued, it relates back to the inception of the rights of the patentee, in so far as it may be necessary to cut off intervening rights and claimants.

It sometimes happens, under the pre-emption laws, that the legal title may be in one person, and a superior equity in another. But such cannot occur under the operation of the United States mining laws. The statute providing for adverse proceedings in the land office and adverse suits in the courts, all legal and equitable adverse titles and claims must be presented to and passed upon by the courts prior to the issuance of the patent, or be considered stale and abandoned.

In the case of *Miller* v. *Girard*, (Colo. App.) 33 Pac. 69, it appears from the facts, as stated by the court, that the Long John lode was located in 1883. Sometime thereafter a claim known as the "North Star" was located in such a manner as to include within its exterior boundaries a portion of the Long John claim, including the discovery shaft. Thereafter, the owners of the North Star obtained a patent to their claim, including the ground on which the Long John discovery shaft had been sunk. The owners of the Long John did not file a protest, nor object to the issuance of the patent to the North Star claim. In 1888 the Aurora and Elgin claims were located, and we would infer that these locations included a portion of the Long John location. After such location, the owners of the Aurora and Elgin claims made application for a patent, and, while the advertisement was pending, the owners of the Long John commenced adverse proceeding. The priority of the Long John location was conceded, and also that the assessment work had been done each and every year since its location; but it was contended, on the part of the owners of the Aurora and Elgin locations, that the fact of the North Star claim having been located subsequent to the Long John, and the North Star Company having secured a patent to its location, which included the Long John discovery shaft, the residue of the Long John

location reverted to the public domain, and was open to exploration and location by the parties making the Aurora and Elgin locations.

In passing on this question, Bissell, P. J., speaking for the court said: " Ever since the decision of the case of *Gwillim* v. *Donnellan*, 115 U. S. 45, 5 Sup. Ct. 1110, it has been the conceded and established law that if a locator permits an adjoining claimant to obtain a patent from the government for that portion of his territory which includes his discovery shaft, and he is without another which gives him a superior right as against the contesting claimant, he must be adjudged to have lost title to whatever territory is embraced within the lines of his claim. That case unquestionably decides that, if the locator permits the adjoining occupant to patent that part of his territory, it is the equivalent of an adjudication that he is without title, and the remaining part of his location reverts to the condition of public lands, and is open to location and purchase by other citizens and claimants, unless the locators, in some legal fashion, have initiated a new title."

Applying the above rule, which we think is a correct one, to the case under consideration, if the defendants' grantors did locate the Phœnix claim in 1887, which location crossed the Comet claim diagonally, but did not include any of the workings on the Comet location, but all of the workings of the Phœnix claim are within the territorial limits of the Comet claim; and it is also admitted by the answer that the plaintiff re-entered in the month of April, 1888, and resumed work on the Comet claim, made final proof and payment for the land, and obtained a patent therefor, including the workings of the Phœnix Company. Such being the case, and the defendants failing to file a protest or interpose any objections to the resuming of work, or the making of the final proof or payment, by the plaintiff, upon which its patent issued, they are to be treated as having voluntarily waived whatever rights they may have acquired under their location, for, upon the issuance of the patent to the plaintiff, it related back to, and took effect as of, the date of the original location. (*The Eureka Case*, 4 Sawy. 317; *Lee* v. *Stahl*, 9 Colo. 210, 11 Pac. 77; *Kannaugh* v. *Mining Co.*, 16 Colo. 346, 27 Pac. 245; *Seymour* v. *Fisher*, 16 Colo. 191, 27 Pac. 240.)

The questions as to the location, marking off boundaries, working, or improvements made upon mining claims are all questions of fact, or mixed questions of law and fact, and the decisions of the officers of the land department thereon are final. If the defendants did not file a protest with the register and receiver after their location, and before the plaintiff made its final proof and payment, it was their own fault. The evidence which they now propose to introduce, as to the abandonment of the claim, was known to them before the final proof and payment was made, and should have been taken advantage of at that time. The charge of fraud is vague and indefinite, and, if any fraud was committed, the United States is the proper party to take the necessary proceedings to have the patent declared void. The defendants, not having connected themselves with the government title, cannot attack the patent. It is enough for them to show that the plaintiff was not entitled to have received the patent. They must also show that they occupy such a status towards the property as entitles them to control the legal title. (*Plummer* v. *Brown*, 70 Cal. 545, 12 Pac. 464; *Johnson* v. *Towsley, supra; Smelting Co.* v. *Kemp, supra; Buckley* v. *Howe*, (Cal.) 25 Pac. 133.)

The plaintiff cannot be held as a trustee for the defendants. This is not one of that class of cases, of which many instances may be found in the decisions of courts, wherein a party receiving a patent from the United States has been declared to hold the legal title merely in trust for another claiming to have a superior equity. There is no privity between the plaintiff and the defendants; they are strangers to each other's titles. No circumstances are alleged or claimed to exist between them, such as to create the relationship of trustee and *cestui que* trust, and the defendants ask for no such relief in their answer, but, upon the contrary, the defendants' claim is that, by reason of adverse possession of the premises in controversy, they have acquired a title to the claim as against the entire world. (*Collins* v. *Bartlett*, 44 Cal. 380.)

It is admitted in the answer that the top or apex of the Phœnix mining claim, and the lode therein, and all the workings thereon, are within the surface boundaries of the Comet location, and on the plaintiff's patented ground, but

that the Phœnix ledge is not the ledge located by the plaintiff or its grantors, and is not the ledge patented; and is more than 300 feet from the center of the Comet ledge.

As we understand the argument of the appellants' counsel, it is this: That, the plaintiff's grantors having discovered a ledge, and having reason to believe that on its strike and horizontal course it ran in a northerly and southerly direction, and made their location accordingly, claiming 1,100 feet along the presumed course of said vein and lode, and 200 feet on each side of the middle thereof, as allowed by the local laws, rules, and customs of the miners of that district, and the patent was issued for the ground so located, the defendants claim that upon further exploration it will be found that the ledge which the plaintiff's grantors located will pass without the east side line of the plaintiff's patented ground, within four or five hundred feet of the south end thereof, and that, by so passing without the side line, the said side line does not only become the end line, to determine its claim to the ledge, but also determines the end of its surface boundaries; and the appellants contend that the plaintiff cannot claim but 200 feet of surface ground north of the point where its ledge is supposed to have crossed its side line, notwithstanding plaintiff holds the government title to six or seven hundred feet north of said point; and the counsel claims that it was not within the power or jurisdiction of the officers of the land department to issue the patent for that portion of the surface ground north of such point, and that the patent is absolutely void as to that portion of the surface ground, and that the defendants had a right to enter upon the north end of the Comet location, and locate any ledge, the top or apex of which was within the surface boundaries of the patented ground.

True it is that if the grantors of the plaintiff were so unfortunate as to locate the Comet ledge in such a manner as that, instead of the vein or ledge continuing lengthwise through the center of the location, it should so far depart from such course and direction that it will pass without the east side line, under such circumstances, the side line becomes the end line, to determine the extent to which the plaintiff can work on or follow the ledge, but does not in any manner affect its ownership to the land embraced within the surface boundaries

of its patented ground. (*Mining Co.* v. *Tarbet*, 98 U. S. 463.)

Section 2319 of the revised statutes reads: "All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase and the lands in which they are found to occupation and purchase."

Prior to July 26, 1866, the government title to mineral lands could not be acquired. Nevertheless, the government recognized the possessory rights of miners, and their rules and regulations in relation to the holding and working the same; yet they were reserved from survey, from pre-emption, and from all grants. (*U. S.* v. *Gratiot*, 14 Pet. 537; *Mining Co.* v. *Consolidated Min. Co.*, 102 U. S. 175; *Morton* v. *Nebraska*, 21 Wall. 667.)

By the act of 1872, not only the veins, lodes and ledges are open to exploration and purchase, but the land in which they are found is also declared open to occupation and purchase to the extent allowed by the United States mining laws, and the rules and regulations of the miners within the district in which the claim is situated, and the land so defined constitutes a mining claim. The intention of congress in enacting this law was to dispose of the government title to the mineral lands, and this meant that the absolute title could be acquired therein. It did not mean simply an easement, with the right of the owner to pass over the ground in going to and returning from his work, or dumping privileges. The right to occupy and to purchase means the right to acquire the title in fee simple, and the right to acquire such a title is followed by the right to the exclusive enjoyment of the entire surface ground embraced within the lines of the location; and the land described in the patent to the plaintiff is withdrawn from the public domain as though it was a homestead or pre-emption entry. (*Belk* v. *Meagher*, 104 U. S. 283; *Forbes* v. *Gracey*, 94 U. S. 762; *Butte City Smoke-House Lode Cases*, (Mont.) 12 Pac. 860; *Deffeback* v. *Hawke*, *Talbott* v. *King*, and *Beard* v. *Federy*, *supra*.)

By virtue of its patent, the plaintiff is the owner of all veins, lodes, and ledges, the top or apex of which lies inside the surface lines of its location. Most, if not all, patents for mining claims contain the following: "The premises hereby conveyed, with the exception of the surface, may be entered

by the proprietor of any other vein, lode, ledge or deposit, the top or apex of which lies outside the exterior limits of said survey, should the same in its downward course, be found to penetrate, intersect, extend into, or underlie the premises hereby granted, for the purpose of extracting and removing the ore from such other vein, lode, ledge or deposit." This reservation in the patent specifies the conditions and stipulations under which it is issued. It does not authorize a party to enter upon the surface and make a location, nor does it permit the owner of an adjoining location to enter upon the surface. He may follow his ledge beneath the surface, but he cannot enter upon the surface and sink a shaft for the purpose of hoisting the ore to the surface at less expense than he could through his own ground, without first obtaining consent of the owner of the adjoining claim. (Section 2322, Rev. Stats. U. S., "Mineral Laws"; *Mining Co.* v. *Cheesman*, 116 U. S. 533, 6 Sup. Ct. 481; *Iron Silver Min. Co.* v. *Elgin Smelting Co.*, 118 U. S. 198, 6 Sup. Ct. 1177; *Mining Co.* v. *Campbell*, 135 U. S. 293, 10 Sup. Ct. 765; *Mining Co.* v. *Sweeney*, 4 C. C. A. 329, 54 Fed. 290.)

In the case of *Mining Co.* v. *Leach*, 33 Pac. 421, the supreme court of Arizona said: "It was argued, during the presentation of this case by the appellants, that a mining claim, to be valid, must be located along the course of the lode; that the statute contemplates that it shall be so done. The statute, as we understand it, only intends to prescribe the limit of extent along the course of the lode that the locator may claim, not that he shall locate, so that the greatest dimension of his claim shall coincide with the course of the lode. It is provided that the extreme extent along the lode shall not exceed 1,500 feet. It may be less. And if the miner, in making his location, should mistake the direction of the lode upon which he locates, and accordingly make the extreme dimensions of his claim in a direction other than that of the lode, that fact does not invalidate his claim, but only operates to diminish the extent of the lode that he might have included within the boundaries of his claim. Of course, congress expected that the miner would avail himself of the privilege accorded him, and locate along the course of the lode, but it does not require him to do so. The only result of not so locating is that the locator gets less, in

extent, of the lode, than he otherwise would have located, and that if the side lines, instead of the end lines, cross the course of the lode, in order to define the locator's rights to pursue the lode on its dip, the side lines will be treated as the end lines."

The title to the land in controversy being in the government, the plaintiff having connected itself with that title, and the extent of its claim not being in excess of the number of feet allowed by the United States mining laws, or the local rules and regulations of the miners within the district, the plaintiff is the owner of all the surface ground described in its patent, and of all ledges, the top or apex of which lies inside of such surface boundary lines.

The appellants contend that the respondent is estopped to maintain this action by reason of its acts in suffering and encouraging them to locate the property, and expend money and labor in discovering and developing the ledge. This contention is untenable. There was no relation of confidence or trust between the plaintiff and the defendants, and none is alleged in the answer or claimed to exist. They were not dealing at all with each other. It does not appear that the plaintiff made any representations concerning material facts, or any statement at all, to the defendants. But it does appear that the defendants were conversant with the facts in relation to the plaintiff's title, for they so state in their answer. Therefore, they were not misled. (*Boggs* v. *Mining Co.*, 14 Cal. 366; Kerr, Fraud & M., 93; Bigelow, Fraud, 438; *People* v. *Brown*, 67 Ill. 437.)

The case presented by the defendants is not covered by the law of estoppel. They and their grantors knew that the lands were mineral lands, and were claimed as such by the plaintiff, and that the title to them could be acquired only under the laws of the United States, and from the United States; and there is no pretense that the defendants ever sought, or contemplated seeking, the title to them from the government, or claimed them in any way or manner except adversely to the plaintiff, and now they allege that they claim them as against the United States and the world. (*Martin* v. *Zellerbach*, 38 Cal. 314.)

The defendants' counsel argues that, they having been in the possession of the premises for more than two years, hold-

ing adversely to the plaintiff, they have gained a title by prescription; and they rely upon sections 3632 and 3664 of the general statutes of Nevada in support of this contention.

Section 3632 reads as follows: " No action for the recovery of mining claims, or for the recovery of the possession thereof, shall be maintained, unless it appears that the plaintiff, or those through or from whom he claims, were seized or possessed of such mining claim, or were .the owners thereof, according to the laws and customs of the district embracing the same, within two years before the commencement of such action. Occupation and adverse possession of a mining claim shall consist in holding and working the same, in the usual and customary mode of holding and working similar claims in the vicinity thereof. All the provisions of this act, which apply to other real estate, so far as applicable, shall be deemed to include and apply to mining claims; *provided*, that in such application ' two years ' shall be held to be the period intended whenever the term ' five years ' is used; *and provided, further*, that when the terms ' legal title ' or ' title ' are used, they shall be held to include title acquired by location or occupation; according to the usages, laws, and customs of the district embracing the claim."

Section 3664 reads: " No action for the recovery of real property, or for the recovery of the possession thereof other than mining claims, shall be maintained, unless it appears that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the premises in question, within five years before the commencement thereof."

The act defining the time of commencing civil actions was approved November 21, 1861. (Stats. 1861, p. 26.) It was amended in 1867, so as to read as set forth in section 3632, while section 3664 was passed, as a supplementary act, in 1869.

As between parties having no higher title than such as is derived from mere occupancy or possession, an action would undoubtedly be barred at the expiration of two years' adverse possession, under the above statutes. Do the above acts apply and run as against a party who has connected himself with the government title? The plaintiff, holding a patent to the land issued by authority of the United States, was invested with the highest title known to the law, and five

years had not elapsed after the issuance of the patent, and before the commencement of this action.

Congress has the absolute power to dispose of the government land, and this power is subject to no limitation. No state legislation can interfere with this right, for it is well settled that the statute of limitations of a state cannot run against the United States, by the third subdivision of the ordinance adopted with our constitution: "That the people inhabiting said territory do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States." Therefore, the statute did not begin to run against the plaintiff's cause of action until after the issuance of the patent, which is alleged to be on the 29th day of March, 1888. (*King* v. *Thomas*, (Mont.) 12 Pac. 867; *Redfield* v. *Parks*, 132 U. S. 241, 10 Sup. Ct. 83.)

Was the plaintiff's cause of action barred in two years after the issuance of the patent, or does it require five years' adverse possession, as provided by section 3635, which reads: "In every action for the recovery of real property, or the possession thereof, the person establishing a legal title to the premises, shall be presumed to have been possessed thereof within the time prescribed by law; and the occupation of such premises by any other person shall be deemed to have been under, and in subordination to, the legal title, unless it appears that such premises have been held and possessed adversely to such legal title for five years before the commencement of such action."

I think the section last quoted should govern this case, for the reason that the issuance of the patent to the plaintiff gave new rights. The patentee then had a right superior to any theretofore owned or held by it, viz., the absolute owner in fee simple—the highest and best title known to a court of law.

In passing upon the statute of limitation, the court is in duty bound to take into consideration the nature and character of the property, and the title by which the same is held, upon which the statute is intended to act. Such being the case, it is a well-known fact that, prior to 1866, no title to mineral lands could be acquired. The rights the miners had

were those of occupancy and possession so long as they con-
formed to the rules, regulations, and customs of the miners
within the district where the claims were situated. This
right of occupancy was recognized and permitted by the
United States, and the rules and regulations of the miners
were recognized and enforced by the courts of the mining
states and territories. (*Gore* v. *McBrayer,* 18 Cal. 588; *Cole-
man* v. *Clements,* 23 Cal. 248.)

Under this condition of affairs, section 4 of the statute of
limitations was enacted in the month of November, 1861.
The object of this statute was to prevent the occupation of
large tracts of mineral land without any title but that of the
right of possession, and without working the same for an
unreasonable length of time.

. The intention of the legislature is the leading, and in fact
the only, object to be inquired into by a court in construing
legislative enactments; and it must be conceded that the first
and most direct means in arriving at that intention is in the
application and meaning of the language used. Therefore,
when the legislature used the words, " seized or possessed of
such mining claim, or were the owners thereof, according to
the laws and customs of the district embracing the same. *
* * Occupation and adverse possession of a mining claim
shall consist in holding and working the same, in the usual
and customary mode of holding and working similar claims
in the vicinity thereof "—they wished to be understood as
meaning that the act was to apply to claims held by loca-
tion and possession only, and. he who could not show a
higher title than that of a possessory right could not main-
tain his action against one who had entered therein and held
adversely for two years.

If the purchasing of the land from the government gives
no greater rights or privileges to the holder of the patent
than he would have under his possessory right, then it is a
useless waste of time and money in applying for a patent.
That this is not the case, and that he who has made his appli-.
cation for a patent, and paid the purchase price for the land,
is entitled to greater privileges, is shown by the rulings of
the commissioner of the general land office, and the decisions
of the United States and state courts, in this:   A party hold-
ing by possession is required to perform the annual labor or.

make improvements each year, but, the moment he receives the receipt showing that he has paid for the land, he is not required to do the work, nor make the improvements, pending the decision on his application and the issuance of the patent. (*Aurora Hill Con. Min. Co.* v. *Eighty-Five Min. Co.*, 12 Sawy. 359, 34 Fed. 515; *Deno* v. *Griffin*, 20 Nev. 250, 20 Pac. 308; *Benson Mining Co.* v. *Alta Mining Co.*, 145 U. S. 430, 12 Sup. Ct. 877.)

Nor is the patentee required to perform labor or make improvements on his claim after he receives his patent. The legislature of Montana enacted a law barring the right of recovery of a mining claim where the owner had not been in possession within one year before the commencement of the action. Congress extended the time for the doing of the assessment work. The locator had not been in the possession of his claim for over eighteen months, and others relocated the claim. In passing upon the validity of this statute, Chief Justice Waite said: "Under the act of congress, as has just been seen, the original locators, or their grantees, had what was equivalent to a grant by the United States of the right to the exclusive possession and enjoyment of the property until January 1st. The Montana statute, if in any respect it is repugnant to this, was repealed to the extent of such repugnancy by the act of congress. As between possessors having no other title than such as is derived from mere occupancy, an action would undoubtedly be barred by the Montana statute." (*Belk* v. *Meagher*, 104 U. S. 286.)

As hereinbefore stated, prior to 1866 the government title to mineral lands could not be obtained. By the statute of July 26, 1866, any person or association of persons claiming a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, or copper, having previously occupied and improved the same according to the local rules and customs of the miners in the district where the same was situated, and having expended, in labor and improvements, an amount of not less than $1,000, and in regard to whose possession there is no controversy or opposing claim, was permitted to file his application for a patent, and the diagram filed with the application for patent should be so extended, laterally or otherwise, as to conform to the local laws, customs and rules of miners. But, under that act, no plat or survey or descrip-

tion should in any case cover more than one vein or lode, and no patent should issue for more than one vein or lode, which should be expressed in the patent. No location thereafter made should exceed 200 feet along the vein or lode for each location, with an additional claim for discovery, together with a reasonable quantity of surface ground for the convenient working of the same. Under the law of 1866, the vein, lode, or ledge was the only thing that could be located; the surface ground was not subject to location. Parties discovering a vein or lode were entitled to locate 200 feet for discovery. They could follow that ledge in any direction it might turn, but the only claim they had to the surface adjoining was the privilege of using it for convenient working of their ledge. Another party discovering a vein, lode, or ledge running parallel with the original location, and within ten feet of it, being a separate ledge, could locate and hold the same, and procure a patent for it, notwithstanding its close proximity to the original location.

By the act of congress of 1872 the entire system of locating and holding mining claims was changed. One or more persons can locate 1,500 feet in length, and not to exceeed 600 feet in width; and not only are the veins, lodes, and ledges offered for sale, but also the land in which they are found. And, under the act, a patent will not be issued for the vein, lode, or ledge alone. The application must embrace the quantity of surface ground, as allowed by the act, or the local rules of the district; and, when the patent issues, it vests in the patentee the title in fee simple, not only to all the surface ground embraced within the calls of the patent, but also all veins, lodes, and ledges, the top or apex of which lies inside of the surface boundaries of such location.

I think that, under the act of 1872, new and greater privileges were granted to the locator, and, when he has connected himself with the government title, his rights assume the character, and his property is to be governed by the rule as provided for in sections 3634 and 3635. Congress has made the possession of public land, which is valuable for mineral, separate and distinct from the fee; and, in recognizing the possessory rights of miners while the paramount title remained in the government, by section 9 of the act of February 27, 1865 (Rev. Stats., sec. 910), it was enacted "that no

possessory action between individuals in the courts of the
United States for the recovery of mining titles should be
affected by the fact that the paramount title to the land was
in the United States, but that each case should be adjudged
by the law of possession."

 · And it seems to me that the legislature took the same view
by the acts of 1867 and 1869; and when the language, "or
were the owners thereof, according to the laws and customs
of the district embracing the same," in the first paragraph,
"*and provided further*, that when the terms 'legal title' or
'title' are used, they shall be held to include title acquired
by location or occupation, according to the usages, laws and
customs of the district embracing the claim," in the closing
paragraph of section 3632, was used, it wished to be under-
stood that the act should apply to ownership or title acquired
by location and possession only, and not to the title in fee
acquired from the government. The land department of the
United States, in speaking of the ownership of land, uses
the term, "owner by right of possession, or title by posses-
sion;" but, after the title has passed from the government, it
is then spoken of as the fee being in the patentee. The
government has said to the miner: "You may occupy and
possess the mineral lands of the United States. You may
extract the ores and minerals therefrom. Yes, you may sell,
and give a good and valid title thereto. But you cannot
assert this right as against the government, who is the owner
of the paramount title, and has reserved unto itself the right
to extend, limit, or abolish this right of possession at any
time." And, when the government issued its patent to the
plaintiff, it gave the plaintiff a title in fee, which, having been
fixed by the rules of property, which are a part of the
general law of the state, cannot be divested by a section of
such law which was enacted merely to regulate neighborhood
customs or regulations, which were and are intended to apply
to the possessory rights of individuals only, and not to the
title derived from the government. When, as in this case,
the language used in sections 3632 and 3664 are supposed to
conflict with the language and leading design as expressed in
several other sections of the same act, can there be a better
or safer rule than to place that construction upon them which
will reconcile and harmonize, with the nature of the title to

Points decided.

the property, the evident intention of the lawmakers, and, to my mind, what is equitable and just? It frequently becomes the duty of the court, in giving effect to statutes, to restrain, enlarge, or qualify the ordinary and literal meaning of the words used. (Sedg. St. &. Const. Law, 199, 209.)

For the reasons above given, I dissent from the views expressed by my associates in relation to the construction that should be placed upon the statute of limitations, and I think the judgment sustaining the demurrer should be in all things affirmed.